UNITED STATES of America,
Plaintiff–Appellee,

v.

Seifullah MUHAMMAD, Defendant–
Appellant.

No. 96–2434.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 21, 1997.

Decided July 21, 1997.

Barry Rand Elden, Chief of Appeals, Diane L. Saltoun (argued), Office of the United

States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Susan Bogart (argued), Chicago, IL, for Defendant–Appellant.

Before CUMMINGS, RIPPLE, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Seifullah Muhammad was called upon to serve a vital civic duty—he was chosen to be a juror in a civil trial in federal district court. Muhammad abused this position, however, by soliciting a bribe from the defendant in that trial in return for his promise to sway the jury in the defendant's favor. The defendant reported Muhammad's scheme to the district judge, and the FBI subsequently thwarted Muhammad's plan. The Government later indicted Muhammad for bribery and obstruction of justice, a jury convicted him of the crimes, and a district judge sentenced him to sixty months in prison. Muhammad now makes several challenges to his convictions and his sentence, none of which contain any merit. As such, we affirm.

## I. HISTORY

On August 21, 1995, Seifullah Muhammad was selected as one of eight jurors to serve in the civil trial of *Jesus Favala v. Cumberland Engineering Company* (No. 88 C 8759) in the United States District Court for the Northern District of Illinois. Favala was suing Cumberland Engineering for $1.8 million based on the personal injury he sustained while working at Cumberland in 1988.

On August 23, 1995, Muhammad called Cumberland Engineering in South Attleboro, Massachusetts where he reached the company's answering machine. He left a message, along with a pager number where he could be contacted, stating that he could "help you all out" in the *Favala* case. The next morning, Muhammad again called Cumberland stating that he wanted to speak with Vincent Picarello—a Cumberland executive who was representing the company at trial—because he had information regarding the trial. Muhammad refused to give his name, but he left a telephone number where he could be reached for the next half hour and emphasized that someone should contact him as soon as possible because closing arguments were beginning that morning.

At 8:15 that morning, the lawyer representing Cumberland at the *Favala* trial (Thomas Doell) called the telephone number, which belonged to a pay telephone in an office building located nearby the federal courthouse. A male voice answered the call and asked, "What is this case worth to Cumberland?" The person refused to identify himself and would not state what type of help he could provide, but he repeatedly asked what Cumberland would pay for help with the case. The Cumberland lawyer declined the offer of assistance, and then he informed the trial judge of the telephone conversation. The judge passed this information onto the U.S. Attorney's office, and the FBI subsequently learned of Muhammad's proposition to Cumberland.

That same day, the parties presented their closing arguments in the *Favala* case. The jury, however, did not begin its deliberations. Later that afternoon, an FBI agent placed two undercover calls to the pager number Muhammad had left on Cumberland's answering machine. The FBI had previously discovered that the pager number was registered to Muhammad's employer and assigned to Muhammad. At about 3:50 p.m., Muhammad responded to the second page. An undercover agent acting as a Cumberland employee and calling himself "Mark" inquired about whether Muhammad could help. During the conversation, Muhammad revealed that he was a juror in the *Favala* trial and that he was willing to sway other jurors to return a favorable verdict for Cumberland. Mark asked Muhammad what he wanted in return, and Muhammad replied $2,500. They then agreed that Mark would pay half of the $2,500 before jury deliberations and the other half after the jury returned its verdict. Muhammad and Mark agreed to meet at 8 a.m. at the Dunkin' Donuts on Clark and Madison streets the next morning in order to exchange the first half of the money. Mark gave Muhammad a physical description of himself and indicated that he would be wearing a gray suit, white shirt, and purple tie. Muhammad refused to iden-

tify himself or provide his own physical description.

The next morning—August 25, 1995—Mark and several other FBI agents went to the Dunkin' Donuts. Mark, however, wore a green tie with gray dots rather than a purple tie. Shortly before 8 a.m., Muhammad walked into the Dunkin' Donuts, bought a cup of coffee, and left the store. The agents recognized Muhammad as a *Favala* juror because they had previously observed him at the trial. Once Muhammad left the store, Agent Hickey approached him. Apparently, the FBI had originally planned to arrest Muhammad after Muhammad contacted Mark, Mark gave him the money, and another agent signaled that the exchange had occurred. Even though none of these things happened, Agent Hickey approached Muhammad because he saw something in Muhammad's hands and presumed it was the exchanged money. Agent Hickey identified himself as an FBI agent and asked Muhammad if he was there to pick up some money. Muhammad indicated that he had talked about receiving $2,500. At that time, Agents Gandolfo and Denny arrested Muhammad and took him to the nearby FBI offices.

While at the FBI offices, the agents orally advised Muhammad of his *Miranda* rights for the first time. Muhammad eventually signed a waiver of his *Miranda* rights about twenty minutes after his initial arrest. After waiving his rights, Muhammad confessed to being a juror in the *Favala* case, making telephone calls to Cumberland including the initial voice message, speaking with Cumberland's lawyer and offering his help, telling the undercover agent (Mark) that he would influence the other jurors in exchange for $2,500, arranging the meeting with that agent at the Dunkin' Donuts, going to the Dunkin' Donuts to receive part of the money, and not recognizing anyone at the Dunkin' Donuts fitting Mark's description and wearing a purple tie.

In a two-count indictment, the Government charged Muhammad with bribery, 18 U.S.C. § 201, and obstruction of justice, 18 U.S.C. § 1503. Muhammad subsequently filed a motion to dismiss the indictment on multiplicity grounds, a motion requesting that the Government produce all statements made by him, and a motion to suppress his pre- and post-arrest statements. The district court denied the motion to dismiss based on multiplicity, ordered the Government to produce all statements made by Muhammad, and granted Muhammad a hearing on his motion to suppress. In response to the production motion and the court's subsequent order, the Government produced a transcript of a consensual tape recording containing statements made by Muhammad after his arrest, a report of Muhammad's post-arrest interview (*i.e.*, an "FBI 302"), and a signed waiver of Muhammad's *Miranda* rights. Despite Muhammad's requests, however, the Government did not produce the notes taken by Agent Gandolfo during the post-arrest interview that he used to prepare the FBI 302.

At the suppression hearing, the court suppressed the statements made by Muhammad outside the Dunkin' Donuts because they were taken in violation of *Miranda*. The court, however, permitted the Government to use the statements made by Muhammad after he was given and waived his *Miranda* rights. After a three-day trial, a jury convicted Muhammad of both bribery and obstruction of justice.

The district court sentenced Muhammad to sixty months in jail and three years of supervised release. The court enhanced Muhammad's base offense level by eleven points pursuant to U.S. Sentencing Guidelines (USSG) §§ 2C1.1(b)(2)(A) & 2F1.1(b)(1)(L), using the $933,000 jury award in the *Favala* case as the "benefit" that Cumberland would have received had Muhammad remained on the jury and been able to influence the verdict. The court also denied Muhammad's requests for reduction in his base offense level based on his arguments that he accepted responsibility, *see* USSG § 3E1.1, and that he never completed the charged offenses, *see* USSG § 2X1.1.

## II. ANALYSIS

### A. Sufficiency of the Evidence and Defendant's Proposed Jury Instructions

At trial, Muhammad's defense to the bribery and obstruction of justice charges rested

upon his assertion that he had not actually completed the crimes. Muhammad now offers a similar challenge on appeal, arguing that the evidence did not sufficiently support the guilty verdict. Specifically, Muhammad asserts that the Government's evidence failed to demonstrate that he took a "substantial step" towards committing the crime of bribery and that his telephone conversations did not have the "natural and probable effect" of interfering with the due administration of justice via the jury deliberations. In developing these sufficiency of the evidence arguments, Muhammad further asserts that the court erred in refusing to give his proffered jury instructions, which outlined his defense theory.

■ The evidence at trial sufficiently supports a criminal jury verdict when "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see also United States v. Brown,* 71 F.3d 1352, 1354 (7th Cir.1995). In reviewing sufficiency of the evidence claims, we construe "all the evidence and all the reasonable inferences that can be drawn from the evidence in the light most favorable to the government." *United States v. Briscoe,* 896 F.2d 1476, 1504 (7th Cir.1990) (quoting *United States v. Nesbitt,* 852 F.2d 1502, 1509 (7th Cir.1988)). Additionally, when reviewing jury instruction determinations, we examine the jury instructions as a whole and refrain from interfering with them so long as they "treat the issues fairly and adequately." *United States v. Brandon,* 50 F.3d 464, 468 (7th Cir.1995); *United States v. Simone,* 931 F.2d 1186, 1193 (7th Cir.1991).

### 1. Bribery—18 U.S.C. § 201(b)(2)(A)

In regard to the bribery charge under 18 U.S.C. § 201(b)(2)(A), Muhammad claims that the Government failed to prove him guilty beyond a reasonable doubt because he never took a substantial step towards accepting or receiving a bribe. Muhammad argues that the Government essentially charged him with "attempted" bribery because it charged him with soliciting, demanding, seeking, or receiving a bribe rather than actually accepting a bribe. Because the only evidence against him consisted of telephone conversations regarding his future actions involving the bribe, Muhammad maintains that the Government failed to prove that he acted with the specific intent to commit the offense and that it failed to demonstrate that he took a "substantial step" towards completing the crime.

■ The federal bribery statute found at 18 U.S.C. § 201(b)(2)(A) provides that a public official[1] commits bribery when he "corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally ... in return for ... being influenced in the performance of any official act." The language in the statute is disjunctive. In other words, a defendant violates § 201 by merely seeking or demanding a bribe, regardless of whether he accepts or even agrees to accept it. *See, e.g., United States v. Gallo,* 863 F.2d 185, 189 (2d Cir.1988) (holding that § 201(b) "makes *attempted* bribery a crime, and so long as a bribe is 'offered or promised' with the requisite intent 'to influence *any* official act' the crime is committed") (quoting *United States v. Jacobs,* 431 F.2d 754, 760 (2d Cir.1970)); *United States v. Arroyo,* 581 F.2d 649, 654–55 (7th Cir.1978) (maintaining that bribe solicitation alone imposes criminal liability); *see also United States v. LeDonne,* 21 F.3d 1418, 1425 (7th Cir.1994) (analyzing disjunctive nature of clauses in bank fraud statute).

■ At trial, the Government provided substantial evidence demonstrating that Muhammad eagerly sought a bribe from Cumberland. Significantly, Muhammad twice contacted the company, leaving a pager number and a telephone number, so the company could inquire what kind of "help" he could provide regarding the *Favala* case. Moreover, Muhammad agreed to receive $2,500 for his assistance in assuring a favorable

---

1. The statute applies to Muhammad because a juror is "selected to be a public official." *See* 18 U.S.C. § 201(b)(2).

Cumberland verdict, he arranged to meet an undercover agent in order to accept half of the bribe, he went to receive the money at the specified time and place, and he admitted that he went to the rendezvous point to receive the money. Contrary to defendant's assertions, these facts reveal that Muhammad eagerly sought the bribe and that he was not merely "feeling out" Cumberland to determine their interest in such an arrangement.

We also find that the district court properly rejected Muhammad's proposed "substantial step" jury instructions regarding the bribery count. Muhammad proposed two instructions regarding his "substantial step" defense theory, and the court incorporated part of the second instruction with parts from the Government's proposed instruction and the Seventh Circuit Pattern Jury Instructions in formulating the final bribery instructions. Specifically, the court refused to use Muhammad's "substantial step" language and accepted only the part of Muhammad's proposed instructions that stated: "It is the defendant's theory of defense to the bribery charge that the Government has failed to show beyond a reasonable doubt that he corruptly demanded, sought or agreed to receive a sum of money."

■ A defendant is entitled to an instruction regarding his theory of the case if (1) the proposed instruction is a correct statement of the law, (2) the evidence supports the theory, (3) the theory of defense is not part of the charge, and (4) the court's failure to include the instruction would deprive the defendant of a fair trial. *See United States v. Schulte*, 7 F.3d 698, 700 (7th Cir.1993); *United States v. Reed*, 991 F.2d 399, 400 (7th Cir.1993). The district court appropriately rejected much of Muhammad's proposed instructions because they included incorrect statements of the law. Contrary to Muhammad's assertions, § 201 does not require the Government to prove that Muhammad took a substantial step towards receiving the bribe. Rather, the statute criminalizes the mere solicitation of a bribe. *See Arroyo*, 581 F.2d at 654-55; *see also Gallo*, 863 F.2d at 189. Because we find that the overall jury instructions regarding the brib-

ery charge treats the issue both fairly and adequately, we reject Muhammad's argument that the district court improperly refused his proposed instructions.

*2. Obstruction of Justice—18 U.S.C. § 1503*

■ Muhammad also maintains that he did not obstruct justice under 18 U.S.C. § 1503 because he did not participate in the *Favala* jury deliberations. In that regard, he further contends that the court erred by failing to instruct the jury that his telephone conversation with the undercover agent could not have influenced the jury deliberations, and therefore his conduct could not have obstructed justice.

Muhammad's argument fails, however, because he was not charged with actually influencing the *Favala* jury deliberations. Rather, the indictment charged that Muhammad "corruptly endeavor[ed] to influence, obstruct and impede the due administration of justice by contacting and attempting to contact parties and witnesses in the case to solicit a bribe from Cumberland ... in exchange for his agreement to work to return a favorable verdict for Cumberland...." In other words, Muhammad was charged with *endeavoring* to obstruct justice, *not actually obstructing* justice.

Section 1503 plainly inculpates a person for endeavoring to obstruct or impede the due administration of justice. *See* 18 U.S.C. § 1503; *United States v. Aguilar*, 515 U.S. 593, 599, 115 S.Ct. 2357, 2362, 132 L.Ed.2d 520 (1995) (noting that "defendant's actions need [not] be successful; an 'endeavor' suffices"); *Osborn v. United States*, 385 U.S. 323, 333, 87 S.Ct. 429, 434-35, 17 L.Ed.2d 394 (1966) (affirming obstruction conviction based on Osborn's employment of a third party to contact a juror even though the third party was an informer who never intended to carry out the scheme); *United States v. Bucey*, 876 F.2d 1297, 1314 (7th Cir.1989) (affirming conviction of defendant who tampered with a fictional witness to a grand jury proceeding). In that regard, "the endeavor must have the 'natural and probable effect' of interfering with the due administration of justice." *Aguilar*, 515 U.S. at 599, 115 S.Ct. at 2362.

But "if the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct." *Id.*

The evidence at trial amply demonstrated that Muhammad intended to affect the outcome of the *Favala* trial, and thus he corruptly endeavored to influence the due administration of justice. Specifically, the evidence showed that Muhammad contacted Cumberland on two occasions to solicit the bribe, he discussed a bribe with Cumberland's attorney, he agreed to receive $2,500 from an undercover agent posing as a Cumberland employee, and he offered to sway the jury in exchange for the $2,500.

Contrary to Muhammad's assertions, the Supreme Court's *Aguilar* decision does not help him. In *Aguilar,* the Court held that a defendant did not knowingly obstruct justice even though he provided false statements to an investigating agent and he was aware of a related, pending grand jury proceeding. *Aguilar,* 515 U.S. at 599–601, 115 S.Ct. at 2362–63. The Court reasoned that even though the defendant knew of the grand jury proceeding, there was no evidence that his statement would be provided to the grand jury, especially where the investigating agent had not been subpoenaed or otherwise directed to appear before the grand jury. *Id.* at 601, 115 S.Ct. at 2363. Thus, the mere act of making a false statement to an investigating agent, without more, did not have the "natural and probable effect" of interfering with the grand jury proceeding. *Id.* Relying on *Aguilar,* Muhammad argues that his telephone conversations discussing the bribe did not have the natural and probable effect of interfering with the jury deliberations.

Muhammad's argument misconstrues *Aguilar*'s holding. *Aguilar* did not state that a defendant's actions must have the natural and probable effect of obstructing justice. Rather, the case holds that a defendant's actions must demonstrate his intent to do something that has the natural and probable effect of obstructing justice:

> Our reading of the statute gives the term "endeavor" a useful function to fulfill: it makes conduct punishable where the defendant acts with an intent to obstruct

justice, and in a manner that is likely to obstruct justice, but is foiled in some way. *Id.* Muhammad, unlike the defendant in *Aguilar,* was a sitting juror in a federal trial and thus was obviously aware of the judicial proceeding he intended to obstruct. The very purpose behind Muhammad's actions was to pervert the integrity of that judicial proceeding. Thus, even though Muhammad could not have affected the *Favala* jury's verdict because his arrest effectively removed him from that jury, his promise to influence the jury's decision in return for $2,500 plainly illustrates his culpability.

As with the bribery count, Muhammad proffered jury instructions setting forth his theory of defense regarding the obstruction count. He sought to instruct the jury that "his actions of talking on the telephone did not have the 'natural and probable effect' of interfering with the due administration of justice, to wit: jury deliberations...." The district court agreed that Muhammad was entitled to a theory of defense instruction, but it rejected the one proffered by Muhammad. Instead, the court gave the Seventh Circuit Pattern Instructions and added the following language: "It is the defendant's theory of defense ... that the Government has failed to show beyond a reasonable doubt that the defendant's words and actions had the natural and probably [sic] effect of interfering with the due administration of justice."

█ We find that the district court properly rejected Muhammad's proposed jury instructions. Muhammad's instructions focused on his inability to influence jury deliberations through telephone conversations. The indictment, however, charged him with "corruptly endeavoring" to obstruct justice and not with actually influencing the jury deliberations. Muhammad's proposed instruction would therefore have provided the jury with an inaccurate account of the charged crime. It also would have given the jury an inaccurate statement of the law—as described above, *Aguilar* provides that a defendant who intends (*i.e.,* corruptly endeavors) to obstruct justice remains culpable even though his plan is thwarted. *Aguilar,* 515 U.S. at 602, 115 S.Ct. at 2363. Muhammad is entitled only to an accurate

statement of the *law, see United States v. Edwards,* 36 F.3d 639, 647 (7th Cir.1994), and his proposed instructions did not do that. Without question, the court fairly and adequately instructed the jury here: it described the obstruction charge in accordance with the pattern jury instructions, it added language that addressed Muhammad's theory of the case, it carefully crafted that "theory" instruction to limit any misleading language, and it permitted Muhammad to argue his theory (*i.e.*, that a mere telephone conversation cannot impair jury deliberations) to the jury. Accordingly, the district court properly rejected the bulk of Muhammad's proffered obstruction of justice instructions.

### B. Motion to Suppress Defendant's Statements

Muhammad next argues that the district court erred in denying his motion to suppress his pre- and post-arrest statements, which he brought pursuant to the Fourth, Fifth, and Sixth Amendments. Specifically, Muhammad claims that the FBI agents violated his Fourth Amendment rights by detaining him without probable cause, that they violated his Fifth Amendment rights by illegally eliciting statements from him outside the Dunkin' Donuts without providing the *Miranda* warnings, and that this flawed "interrogation" tainted the subsequent Mirandized interrogation that other agents conducted at the FBI offices only fifteen to twenty minutes later. Muhammad also argues that the FBI denied him of his right to counsel during this latter interrogation in violation of the Fifth and Sixth Amendments.

Before trial, the district court suppressed the statements Muhammad made to Agent Hickey outside the Dunkin' Donuts, except for those involving Hickey's identification of Muhammad. At trial, the Government neither called Agent Hickey nor introduced evidence of Hickey's identification of Muhammad and therefore, we need not address the propriety of that determination. The district court, however, refused to suppress the statements Muhammad gave to the agents after they advised him of his *Miranda* rights. In doing so, the court ruled that the agents

had probable cause to arrest Muhammad and that Muhammad voluntarily waived his *Miranda* protections before giving his confession. Like the district court, we reject Muhammad's arguments because the evidence plainly demonstrates that the agents had probable case to make the arrest, that Muhammad's subsequent waiver of his *Miranda* rights purged any taint from his prior pre-*Miranda* interrogation, and that the agents did not infringe upon Muhammad's right to counsel.

Probable cause exists when at the moment an arrest is made officers have "facts and circumstances within their knowledge and of which they [have] reasonably trustworthy information" that would sufficiently "warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *see also United States v. Jones,* 72 F.3d 1324, 1331 (7th Cir.1995). This "flexible, common-sense" probable cause standard rests on whether a "man of reasonable caution" would believe that the accused has committed a crime; it does not require that this "belief be correct or more likely true than false." *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983). We review probable cause determinations *de novo.* *Ornelas v. United States,* —— U.S. ——, ——, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996); *United States v. Navarro,* 90 F.3d 1245, 1251 (7th Cir.1996). When reviewing findings of historical fact, however, we give due deference to factual inferences drawn by judges and law enforcement officers. *Ornelas,* —— U.S. at ——, 116 S.Ct. at 1663.

■ The record demonstrates that the FBI agents had ample information giving them probable cause to arrest Muhammad. First and foremost, Muhammad's phone conversations with undercover agent "Mark" revealed that Muhammad solicited a bribe and thus established his culpability for the crimes. Second, the FBI connected Muhammad with "the male voice" who solicited the bribe because it obtained information that the pager number Muhammad left on Cumberland's answering machine was subscribed to the company that employed Muhammad.

Third, the agents at the Dunkin' Donuts were able to further identify Muhammad because they had previously attended the *Favala* trial and recognized him as one of the jurors. Thus, even though Muhammad never took any money, the arresting agents had enough information to conclude that Muhammad had committed a crime.

 Muhammad next argues that the statements he made outside the Dunkin' Donuts before he was advised of his *Miranda* rights tainted the subsequent confession he made to the agents only a short time later at the FBI's offices. We reject Muhammad's argument because any taint from the prior unMirandized confession was cured when the FBI subsequently administered Muhammad his *Miranda* warnings and Muhammad waived those rights. *See Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

In *Elstad,* the Supreme Court held that the government's initial failure to administer *Miranda* warnings can be cured by the subsequent administration of those rights. *Id.* at 309, 105 S.Ct. at 1293. The Court declared that the "subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Id.* at 314, 105 S.Ct. at 1296. In such a case, the factfinder "may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." *Id.* We have also upheld the admission of a defendant's Mirandized confession despite the government's failure to administer *Miranda* warnings prior to the defendant's initial on-the-street statements. *See Stawicki v. Israel,* 778 F.2d 380, 382–83 (7th Cir.1985). Significantly, in *Stawicki* we followed *Elstad*'s directive to focus on the voluntariness of the second confession—*i.e.,* the one made after the defendant waived his *Miranda* rights. *Id.* at 382.

In this case, a routine application of the principles in *Elstad* and *Stawicki* compels our conclusion that the FBI's subsequent administration of *Miranda* warnings to Muhammad, coupled with Muhammad's signed waiver of his *Miranda* rights, purged any taint from the prior illegally-obtained confession and rendered Muhammad's subsequent confession admissible. As in *Elstad* and *Stawicki,* there is no question regarding the voluntariness of the statements Muhammad made outside the Dunkin' Donuts, and therefore we cannot presume any coercive effect on the second fully-warned confession. *See id.* at 382. Moreover, Muhammad's signed waiver, even though it occurred shortly after his on-the-street statements and subsequent arrest, demonstrates that he knowingly and voluntarily relinquished his right to remain silent.

 Finally, Muhammad claims that he was denied his right to counsel because the FBI continued to question him after he requested an attorney.[2] Agent Gandolfo testified that he read Muhammad his *Miranda* warnings from a preprinted form and then asked Muhammad to read the form to himself. As Agent Gandolfo read the warnings regarding the right to an attorney, Muhammad responded, "an attorney." At this point, the agent asked Muhammad if he had an attorney, and Muhammad gestured that he did not. The agent also pushed the telephone across the table so that Muhammad could call an attorney. Muhammad did not call anyone, and Agent Gandolfo continued to read Muhammad his *Miranda* rights. Muhammad stated that he understood his rights, that he wanted to talk to the agents, but that he did not want to sign the waiver of rights form. At that point, the agent told Muhammad that he would not talk with him unless he signed the form. Agent Gandolfo then gave the form to Muhammad and left the room. When the agent returned, he noticed that Muhammad had signed the form and he then began the interview.

---

2. Muhammad claims that the Government violated his right to counsel under both the Fifth and Sixth Amendments. Only the Fifth Amendment (*i.e., Miranda*) right to counsel applies here, however, because adversary criminal proceedings

had not commenced at the time Muhammad was interrogated. *See Davis v. United States,* 512 U.S. 452, 456–58, 114 S.Ct. 2350, 2354, 129 L.Ed.2d 362 (1994).

A defendant must unambiguously request the assistance of counsel in order to invoke his right to an attorney under *Miranda* and thus prevent the interrogator from asking any further questions. *Davis v. United States*, 512 U.S. 452, 458–60, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994); *see also Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981) (holding that the interrogation must cease once the suspect invokes his *Miranda* right to counsel). In *Davis*, the defendant claimed that he had requested a lawyer when he stated, "Maybe I should talk to a lawyer." *Id.* at 462, 114 S.Ct. at 2357. The Supreme Court, however, held that the defendant had not invoked this rigid, prophylactic *Miranda–Edwards* right to counsel because his ambiguous statement was not clear enough to alert a reasonable police officer that he was requesting an attorney. *Id.* at 458–62, 114 S.Ct. at 2355–57; *see also United States v. Scurlock*, 52 F.3d 531, 537 (5th Cir.1995) (finding no clear invocation of right to counsel where suspect agreed to answer questions, admitted to crime, stated that she needed a lawyer, and then proceeded to answer all questions); *Lord v. Duckworth*, 29 F.3d 1216, 1220–21 (7th Cir.1994) (ruling that the statement "I can't afford a lawyer but is there anyway I can get one?" did not constitute an unambiguous request for counsel in the context of the interrogation). During an interrogation, moreover, an officer has no obligation to clarify the ambiguous statement by the accused. *Davis*, 512 U.S. at 461, 114 S.Ct. at 2356.

Muhammad's cryptic reference to "an attorney," especially when compared to defendant's comment in *Davis* that "Maybe I should talk to a lawyer," did not constitute an unambiguous request for counsel. Agent Gandolfo attempted to clarify Muhammad's statement, even though he was not required to do so, by asking Muhammad if he had a lawyer and subsequently pushing the telephone towards him so that he could call a lawyer. *See Davis*, 512 U.S. at 461, 114 S.Ct. at 2356 (noting that it is good police practice, but not an obligation, to clarify a suspect's

statement). More importantly, after giving Muhammad the chance to call a lawyer, Agent Gandolfo continued to explain the waiver of rights form and provided Muhammad with a copy of the form to review himself. Muhammad then signed the waiver of rights form, which plainly listed his right to appointed counsel if he could not afford one. Furthermore, the agents did stop interrogating Muhammad once he unambiguously requested an attorney later in the interview. Based on this evidence, we have no problem concluding that the agents properly determined that Muhammad's statement—"an attorney"—was not an unambiguous invocation of his *Miranda* right to counsel. As such, we affirm the district court's rulings on the suppression motions.

### C. Admission of Agent Denny's Testimony

At trial, Agent Denny—one of the two agents who interrogated Muhammad at the FBI offices—testified about Muhammad's confession. Muhammad raises two errors in regard to the admission of Agent Denny's testimony, both of which invoke his right to confront adverse witnesses pursuant to the Confrontation Clause of the Sixth Amendment. First, Muhammad complains that the court should not have permitted Agent Denny to testify about his postarrest statements, arguing that the agent's testimony did not rely on her personal recollection but rather relied on a written "summary" of the interview—*i.e.*, an FBI 302 report—prepared by the other interviewing agent (Agent Gandolfo). Second, Muhammad claims the court erred by denying him access to the handwritten notes that Agent Gandolfo took during the interview and used to prepare the FBI 302.

▆ Generally, we review the district court's evidentiary rulings for abuse of discretion. *United States v. Adames*, 56 F.3d 737, 743 (7th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 2512, 135 L.Ed.2d 201 (1996). But because Muhammad did not object to Agent Denny's testimony on the above grounds at trial,[3] we review the district

---

**3.** Prior to Agent Denny's testimony at trial, Muhammad objected to the admission of his confes-

sion on hearsay grounds, claiming only that the statements were not incriminating and thus not

court's decision for plain error. *See United States v. Cooke,* 110 F.3d 1288, 1293 (7th Cir.1997). Muhammad must therefore prove that the district court erred in admitting Agent Denny's testimony and that the error was "so egregious as to constitute a miscarriage of justice," *United States v. Beltran,* 109 F.3d 365, 370 n. 1 (7th Cir.1997). *See United States v. Schaefer,* 107 F.3d 1280, 1286 (7th Cir.1997).

▉ We find that the district court committed no error, plain or otherwise, in permitting Agent Denny to testify about Muhammad's statements and in refusing to order the Government to disclose Agent Gandolfo's interview notes. First of all, Agent Denny's testimony was not inadmissible hearsay because she used the FBI 302 report merely to refresh her recollection of the interview. The Federal Rules of Evidence permit witnesses to use reports to refresh their recollection. *See* Fed. R.Evid. 612. The testimony at trial revealed that Agent Denny prepared for trial by meeting with an Assistant U.S. Attorney and reviewing the FBI reports relating to Muhammad's arrest and subsequent interview. Agent Denny testified that although Agent Gandolfo prepared the FBI 302 covering Muhammad's interview, she reviewed that report for accuracy, made corrections to it, and signed it. In essence, the report was that of both Agent Gandolfo and Agent Denny. Agent Denny added that although she did not have independent recollection of all the questions and answers from Muhammad's interview, she did have such recollection at the time the report was prepared and that the report accurately reflected Muhammad's statements at that time. Contrary to Muhammad's contentions, therefore, Agent Denny's testimony stemmed from her personal knowledge and not from the FBI 302. Based on these facts, we find no error in the admission of Agent Denny's testimony regarding Muhammad's post-arrest statements.

▉ Second, Muhammad had no legal basis to compel the Government to produce

party-opponent admissions. The district court properly rejected this argument and determined that Muhammad's statements were not hearsay

Agent Gandolfo's original interview notes that were subsequently incorporated into the FBI 302. A defendant is not entitled to an agent's notes if the agent's report contains all that was in the original notes. *See United States v. Batchelder,* 581 F.2d 626, 635 (7th Cir.1978) (holding that the government did not violate the Jenks Act by failing to produce an agent's handwritten notes, which were discarded after being typed into a summary), *rev'd on other grounds,* 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979); *see also United States v. Balistrieri,* 779 F.2d 1191, 1221 (7th Cir.1985) (holding that the government's failure to produce original 302's did not violate the Confrontation Clause); *United States v. Bastanipour,* 697 F.2d 170, 174–75 (7th Cir.1982) (holding that the defendant's right of confrontation was not abridged where an agent discarded a handwritten draft of a report after the report had been typed). The district court reviewed Agent Gandolfo's interview notes *in camera* and found no inconsistencies between the notes and the FBI 302. Moreover, Muhammad had access to the FBI 302, and his lawyer extensively cross-examined Agent Denny regarding her reliance on that report in preparing her testimony. Evidence of Agent Denny's reliance on the FBI 302 weighs upon the credibility, not the admissibility, of her testimony. Finally, the fact that the notes in question were not taken by the testifying agent illustrates their questionable relevance and thus also weighs against Muhammad's argument for their production. Considering these factors, we find that the district court did not err in refusing to require the Government to turn over Agent Gandolfo's interview notes.

### D. Application of the Sentencing Guidelines

#### 1. Enhancement under § 2C1.1

▉ Muhammad's first sentencing challenge asserts that the district court erroneously enhanced his base offense level by eleven points. The district court applied USSG

under Federal Rule of Evidence 801(d)(2) (admission by a party-opponent).

§ 2C1.1(b)(2)(A) (and that guideline's directive to use the table in USSG § 2F1.1) to enhance Muhammad's base offense level in order to account for the value of the benefit to be received in return for the bribe. The court reasoned that the language of § 2C1.1(b)(2)(A) compelled it to view the $933,000 jury verdict from the *Favala* case as the benefit to be received in return for the bribe because Cumberland would not have had to pay this amount had Muhammad influenced the verdict. Under § 2F1.1(b)(1)(L), the $933,000 "benefit" corresponded to an eleven-point enhancement in Muhammad's base offense level. Muhammad argues that the court should have instead used the amount of the bribe—$2,500— to calculate his offense level, which would have increased the offense level by only one point. Because this sentencing challenge involves interpretation of the guidelines, we review it *de novo*. *United States v. McDuffy*, 90 F.3d 233, 235 (7th Cir.1996).

The plain language of § 2C1.1(b)(2)(A) supports the Government's argument that the district court properly applied the eleven-point enhancement. That section provides: "If the value of the payment, the benefit received or to be received in return for the payment, or the loss to the government from the offense, whichever is greatest, exceeded $2,000, increase by the corresponding number of levels from the table in § 2F1.1 (Fraud and Deceit)." USSG § 2C1.1(b)(2)(A). The guideline's language thus requires the district court to enhance the offense level by the number corresponding to the *greatest* of the following values: (1) the payment (*i.e.*, the bribe), (2) the benefit received or to be received in return for the payment (*i.e.*, the amount of civil judgment that Cumberland would have avoided had Muhammad's plan been successful), or (3) the loss to the government. In this case, the bribe was $2,500, the benefit to be received was Cumberland being relieved of paying the $933,000 damage award, and the

government sustained no *monetary* loss.[4] Without question, the *greatest* of these values is the $933,000, and thus the district court properly applied the corresponding eleven-point enhancement as required by § 2C1.1(b)(2)(A) and § 2F1.1(b)(1)(L).

Muhammad, however, argues that the district court's reliance on the $933,000 award will create a sentencing disparity between his case and other cases where the defendants commit the same acts (*i.e.*, solicit $2,500 bribes) but the juries come back with different verdicts. This variation, Muhammad asserts, defeats the sentencing guidelines' goal of punishing similar conduct similarly. Muhammad claims that instead the court should have enhanced his offense level according to the value of the bribe—$2,500—because the Background section of § 2C1.1 provides that "[w]here ... the value of the benefit cannot be determined, the value of the bribe is used...."

Muhammad raises a good point by noting that the "value of the benefit to be received" might, in some instances, be speculative. For example, the district court would have had a difficult time quantifying the benefit to be received in this case had the jury returned a defense verdict and awarded no damages. In that situation, would it have been appropriate for the district court to look at the amount of damages *sought* by the plaintiff, which was $1.8 million? The question becomes even more complicated in criminal cases where a jury's verdict does not involve monetary damages, but rather a lengthy prison sentence or even the death penalty.[5]

■■■■ We fortunately do not have to decide the more difficult question of how (or even whether) to calculate speculative benefits because the district court possessed a quantifiable figure for the benefit that Cumberland would have received had Muhammad's scheme worked—Cumberland would have been relieved of paying the $933,000 in dam-

---

**4.** We would be remiss to say that the government sustained no loss at all in this case. Our government suffers severely, albeit unquantifiably, whenever someone callously abuses the integrity of our judicial system for his own personal gain.

**5.** Presumably, § 2C1.1 Application Note 4 could deal with these situations. That provision directs courts to upwardly depart when a bribe or the benefit to be received from a bribe does not adequately reflect the seriousness of the offense.

ages. The mere fact that Muhammad's bribe was not successful does not prevent us from using the ascertainable benefit that the bribe intended to influence in order to enhance his sentence. *See, e.g., United States v. Tejada–Beltran*, 50 F.3d 105, 109 (1st Cir.1995) ("The failure to consummate a bribe neither detracts from the donor's culpability nor renders the amount involved ineligible for use in setting the donor's offense level; the guidelines treat solicitations and attempts as equivalent to completed offenses."); *United States v. Falcioni*, 45 F.3d 24, 27 (2d Cir. 1995) (noting that the amount of "intended loss" does not become zero "[s]imply because the government's crime prevention efforts prove successful"). Thus, when a district court can reasonably determine the benefit received (or to be received) in return for a bribe, and that amount is greater than the bribe or any loss to the government, § 2C1.1(b)(2)(A) requires an enhancement corresponding to the amount of that benefit. Compare *United States v. Hang*, 75 F.3d 1275, 1284 (8th Cir.1996), *and United States v. Kant*, 946 F.2d 267, 268–70 (4th Cir.1991), *with United States v. Ellis*, 951 F.2d 580, 585–86 (4th Cir.1991) (refusing to enhance sentence according to "potentially limitless" and difficult-to-ascertain profits that race track company gained as a result of improperly-induced legislation).

Moreover, Muhammad's argument overlooks the purpose of § 2C1.1, which is to measure the true harm from the crime—*i.e.*, the greater of the bribe or the benefit. In this regard, Muhammad conveniently avoided a vital part of § 2C1.1's Background section: "Moreover, for deterrence purposes, the punishment should be commensurate with the gain to the payer or the recipient of the bribe, whichever is higher." In this case, Muhammad cannot credibly claim that the $2,500 bribe was at all commensurate with the benefit Cumberland would have received in avoiding plaintiff's substantial damage claim. Significantly, Muhammad's post-arrest statements reveal that he was aware that Favala sought more than $1 million in damages. Muhammad plainly knew the benefit he was attempting to confer upon Cumberland in soliciting the bribe, and we ac-

cordingly find no error in the district court's eleven-point enhancement.

### 2. *Acceptance of Responsibility—sec. 3E1.1*

Muhammad sought a reduction in his base offense level for acceptance of responsibility, arguing that he admitted his conduct but denied legal guilt under the circumstances. To prevail below, Muhammad needed to "clearly demonstrate" that he was entitled to a reduction under § 3E1.1, and he was required to make this showing by a preponderance of the evidence. *United States v. Webb*, 110 F.3d 444, 446 (7th Cir. 1997); *see* USSG § 3E1.1(a). The district court determined that Muhammad failed to make such a showing, and thus refused to reduce his base offense level by the requested two or three points.

We "give great deference to a trial judge's denial of an acceptance of responsibility reduction, reversing only if clearly erroneous." *United States v. Berry*, 60 F.3d 288, 295 (7th Cir.1995); *see United States v. Cunningham*, 103 F.3d 596, 597–98 (7th Cir. 1996). We utilize *de novo* review, however, when interpreting the sentencing guidelines. *Webb*, 110 F.3d at 446.

Application Note 2 to USSG § 3E1.1 provides that an acceptance of responsibility "adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." In this case, Muhammad obviously put the Government to its proof because the case went to trial. Muhammad appropriately argues, however, that that same Application Note provides that "[c]onviction by trial ... does not automatically preclude a defendant from consideration for such a reduction." USSG § 3E1.1, comment. (n.2). Thus, in a "rare situation[ ]" a "defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct ... where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt." *Id.*; *see also United States v. Thompson*, 76 F.3d 166, 170 (7th Cir.1996). Contrary to Muhammad's assertions, his case does not fit

within this rare exception because he disputed various facts throughout the district court proceedings.

■ Muhammad argues that his post-arrest statements demonstrated that he accepted responsibility for all of his criminal conduct. The evidence at trial and at the sentencing hearing, however, belies this argument. When Muhammad first spoke with the agents after his arrest, he admitted that he left the Dunkin' Donuts store because he could not find anybody fitting "Mark's" physical description and wearing a purple tie. At trial, however, Muhammad challenged this evidence, arguing that Agent Denny lied about this part of his post-arrest statement. Muhammad also maintained throughout the district court proceedings that he walked out of the Dunkin' Donuts because he had abandoned his part in the plan and he did not want to follow through on the bribe. At sentencing, Muhammad further altered his version of the incident by telling the district judge that he went to the Dunkin' Donuts to buy breakfast because he could not afford the breakfast places closer to the federal building. Based on all of this evidence, the district court determined that Muhammad went to the Dunkin' Donuts to pick up the bribe, and thus concluded that Muhammad's conflicting accounts of these facts demonstrated that he had not affirmatively accepted responsibility for his criminal conduct. Because the district court did not err in reaching this conclusion, it properly refused to reduce his base offense level for acceptance of responsibility.

### 3. *Abandonment of Criminal Activity— sec. 2X1.1*

■ Muhammad also asserts that the district court erroneously denied him a downward departure pursuant to USSG § 2X1.1. Specifically, Muhammad claims that he should have received a downward departure of up to three points because he did not carry out his bribery discussions with the undercover agent and he never accepted the one-half payment of the $2,500. Like Muhammad's other sentencing objections, this one lacks merit.

Muhammad's claim fails for two reasons. First, the precise guideline governing Muhammad's conduct provides that an unsuccessful attempted bribery results in the same offense level as a completed bribery. The Background section to USSG § 2C1.1 provides, in pertinent part, that

> [o]ffenses involving attempted bribery are frequently not completed because the victim reports the offense to authorities or is acting in an undercover capacity. Failure to complete the offense does not lessen the defendant's culpability in attempting to use public position for personal gain. Therefore, solicitations and attempts are treated as equivalent to the underlying offense.

Second, USSG § 2X1.1 does not apply to Muhammad's crimes because that section applies only to uncompleted crimes. As discussed extensively above, Muhammad's crimes were completed—he solicited a bribe and he endeavored to obstruct the due administration of justice. As such, we have little trouble in summarily disposing of this frivolous argument.

### E. *Multiplicity*

■ Finally, Muhammad asserts that the district court should have dismissed the indictment as multiplicitous and thereby forced the Government to proceed on only one of the two counts. Specifically, Muhammad complains that the indictment charged him with committing two separate crimes based on identical criminal conduct. Moreover, he maintains that the multiplicitous indictment prejudiced him by creating the impression that more criminal activity than in fact occurred and by subjecting him to multiple sentences for the same conduct. We find no merit in Muhammad's multiplicity claim.

■ We review *de novo* multiplicity challenges to an indictment. *United States v. Hutching,* 75 F.3d 1453, 1460 (10th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 2502, 135 L.Ed.2d 193 (1996); *cf. United States v. Allender,* 62 F.3d 909, 912–13 (7th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 781, 133 L.Ed.2d 732 (1996). "Essentially, a claim of multiplicity alleges that separate counts in an indictment charge a single offense." *Briscoe,* 896 F.2d at 1522. The long-established

*Blockburger* test directs our analysis in this regard: "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied ... is whether each provision requires proof of an additional fact which the other does not." *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); *see Albernaz v. United States,* 450 U.S. 333, 337, 101 S.Ct. 1137, 1141, 67 L.Ed.2d 275 (1981); *United States v. Gonzalez,* 933 F.2d 417, 424 (7th Cir.1991). Applying the *Blockburger* test, we focus on the statutory elements of the charged offenses, not the overlap in the proof offered to establish them, because a single act may violate several statutes without rendering those statutes identical. *See Albernaz,* 450 U.S. at 338, 101 S.Ct. at 1142; *Gore v. United States,* 357 U.S. 386, 389, 78 S.Ct. 1280, 1283, 2 L.Ed.2d 1405 (1958).

In this case, the bribery charge (18 U.S.C. § 201(b)(2)(A)) and the obstruction of justice charge (18 U.S.C. § 1503) each require proof of facts that the other offense does not. Bribery does not require proof that Muhammad knew of a pending judicial proceeding or that he endeavored to influence, obstruct, and impede the due administration of justice, *see* 18 U.S.C. § 1503; and obstruction of justice does not require proof that Muhammad was a public official or that he demanded, sought, or agreed to receive a thing of value for himself in exchange for an official act performed by him, *see* 18 U.S.C. § 201. *Cf. United States v. Langella,* 776 F.2d 1078, 1082 (2d Cir.1985) (holding that perjury and obstruction of justice are distinct offenses under the *Blockburger* test). Each count plainly requires proof of several elements that the other count does not.

Moreover, contrary to Muhammad's assertion, the Government had the discretion to charge Muhammad with both bribery and obstruction of justice. Muhammad's criminal act of seeking a bribe to influence the outcome of a civil trial clearly overlaps both the

bribery and the obstruction of justice statutes. It does not present a situation where only one specifically-tailored statute addresses the alleged offense. *Cf. United States v. Computer Sciences Corp.,* 689 F.2d 1181, 1186–88 (4th Cir.1982), *overruled on other grounds by Busby v. Crown Supply, Inc.,* 896 F.2d 833 (4th Cir.1990). We therefore easily reject Muhammad's multiplicity argument.

For the above reasons, we AFFIRM Seifullah Muhammad's convictions and sentence.