**UNITED STATES of America,
Plaintiff,**

v.

**Tiran Rodez CASTEEL and Devan
Rodez Casteel, Defendants.**

No. 1:08–cr–00053.

United States District Court,
S.D. Iowa,
Western Division.

July 7, 2010.

Chad Douglas Primmer, Primmer Law, Council Bluffs, IA, James F. Whalen, Federal Public Defenders Office, Des Moines, IA, for Defendants.

Clifford D. Wendel, U.S. Attorney's Office, Des Moines, IA, for Plaintiff.

## ORDER

ROBERT W. PRATT, Chief Judge.

Before the Court are numerous post trial motions filed by Tiran Casteel and Devan Casteel (collectively "Defendants"). Devan Casteel filed a Motion for Judgment of Acquittal and New Trial on November 27, 2009. Clerk's No. 266. One month later, on December 29, 2009, Devan Casteel filed an Amended Motion for Judgment of Acquittal and New Trial. Clerk's No. 283. Tiran Casteel, likewise, filed a Motion for Judgment of Acquittal and Conditional Motion for New Trial on February 12, 2010. Clerk's No. 304. The Government filed a combined resistance on March 4, 2010. Clerk's No. 310. The Government filed a supplemental resistance on March 31, 2010. Clerk's No. 314. Tiran Casteel filed a reply on April 28, 2010. Clerk's No. 320. Despite Tiran Casteel's request for a hearing, the Court does not believe one is necessary in light of the trial record. The matters are full submitted.

## I. PROCEDURAL HISTORY

On November 20, 2009, a jury returned guilty verdicts against Defendants on four counts relating to the armed robbery of Darlene Eitzen ("Eitzen") and the unsuccessful attempt to kill her prior to trial. Clerk's No. 259. More specifically, the jury found both Defendants guilty of carjacking, in violation of 18 U.S.C. § 2119, and using or carrying a firearm in relation to a violent crime, namely the carjacking, in violation of 18 U.S.C. § 924. Additionally, the jury found Tiran Casteel guilty of obstruction of justice, in violation of 18 U.S.C. § 1503, and tampering with a witness by attempting to kill, in violation of 18 U.S.C. § 1512. During trial, each Defendant moved for a judgment of acquittal, both at the close of the Government's case-in-chief and at the close of the evidence. The Court denied Defendants' motions. Tr. at 549, 551.

Defendants now renew their Motions for Judgments of Acquittal. Each Defendant argues that the carjacking conviction is fatally flawed because the conduct of the robbers cannot satisfy the presence or intent requirements of the statute. Devan Casteel's Am. Br. at 12–13; Tiran Casteel's Br. at 12–15. Defendants also implicitly assert that there was insufficient evidence for a reasonable jury to conclude that they were the individuals who robbed Eitzen's house and stole her vehicle. Defendants, likewise, argue that the convictions for using or carrying a firearm in relation to a violent crime must be dismissed because the predicate carjacking offense is defective. Devan Casteel's Am. Mot. ¶ 4; Tiran Casteel's Br. at 15–16. Tiran Casteel also argues that the Court should grant a judgment of acquittal on

the obstruction of justice conviction because the Government presented insufficient evidence of either a "threat" or "endeavor." Tiran Casteel's Br. at 16–17. Finally, Tiran Casteel argues that the Court should dismiss the witness tampering charge because the Government never proved that Tiran Casteel went beyond "mere preparation" to a "substantial step." *Id.* at 18. In the alternative, both Defendants request a new trial in the interest of justice, citing insufficient evidence, various erroneous evidentiary rulings, and improper joinder of Defendants for trial. Devan Casteel's Am. Br. at 14–17; Tiran Casteel's Br. at 19–26.

## II. ANALYSIS

### A. *Motion for Judgment of Acquittal*

■ This Court must enter a judgment of acquittal if the evidence presented at trial is insufficient to sustain a conviction. Fed. R. Crim. P. 29(a); *United States v. Water*, 413 F.3d 812, 816 (8th Cir.2005). "This standard is 'very strict' and a jury's verdict should not be overturned lightly." *United States v. Boesen*, 491 F.3d 852, 855 (8th Cir.2007) (quoting *United States v. Ellefson*, 419 F.3d 859, 862 (8th Cir.2005)). Although Rule 29 contemplates the occurrence, it is well-settled that "[j]ury verdicts are not lightly overturned."[1] *United States v. Hood*, 51 F.3d 128, 129 (8th Cir. 1995). Therefore, "[a] motion for judgment of acquittal should be granted only if there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." *United States v. Cacioppo*, 460

F.3d 1012, 1021 (8th Cir.2006); *accord United States v. Moore*, 108 F.3d 878, 881 (8th Cir.1997) (instructing that "[t]he jury's verdict must be upheld if there is an interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt").

■ In considering a motion for judgment of acquittal based on the sufficiency of the evidence presented at trial, the Court must "view the evidence in the light most favorable to the guilty verdict, giving the government the benefit of all reasonable inferences that may be drawn from the evidence." *United States v. Basile*, 109 F.3d 1304, 1310 (8th Cir.1997). The Court can overturn the jury's verdict only if " 'a reasonable fact-finder must have entertained a reasonable doubt about the government's proof' " on one or more of the essential elements of the crime charged. *United States v. Kinshaw*, 71 F.3d 268, 271 (8th Cir.1995) (quoting *United States v. Nunn*, 940 F.2d 1128, 1131 (8th Cir.1991)). "This standard applies even in cases where a confession dominates the government's proof at trial." *United States v. Kirk*, 528 F.3d 1102, 1111 (8th Cir.2008) (citation omitted). In reviewing the evidence presented to the jury, it is important to note that " '[t]he evidence need not exclude every reasonable hypothesis except guilt.' " *United States v. Baker*, 98 F.3d 330, 338 (8th Cir.1996) (quoting *United States v. Erdman*, 953 F.2d 387, 389 (8th Cir.1992)). Finally, it is not the Court's role to weigh the evidence or assess the credibility of witnesses, as these tasks belong to the jury alone. *See*

---

1. Indeed, to do otherwise would risk displacing the jury as the principle trier of fact, thereby establishing the Court in a role the Constitution expressly delegated to the people. In the sage words of another district court, "[T]he jury is an institution of central importance in our system of government, and courts must jealously guard against encroachments on the jury's province. It is the jury to

which the founders of this nation turned to fill the role of impartial fact finder. Its primacy is guaranteed by the United States Constitution, and the American jury system is our most vital day-to-day expression of direct democracy." *United States v. Green*, 346 F.Supp.2d 259, 316 (D.Mass.2004), *vacated and remanded on other grounds by United States v. Pacheco*, 434 F.3d 106 (1st Cir.2006).

*United States v. Ireland*, 62 F.3d 227, 230 (8th Cir.1995) (observing that the jury has the role of judging the credibility of witnesses and resolving any contradictions in the presented evidence).

### 1. *Carjacking.*

▮ In order to sustain a conviction under the carjacking statute, the Government must have proven beyond a reasonable doubt three elements:

(1) the defendant took or attempted to take a motor vehicle from the person or presence of another by force and violence or by intimidation; (2) the defendant acted with the intent to cause death or serious bodily harm; and (3) the motor vehicle involved has been transported, shipped, or received in interstate or foreign commerce.

*United States v. Wright*, 246 F.3d 1123, 1125 (8th Cir.2001) (citing *United States v. Williams*, 136 F.3d 547, 550 (8th Cir. 1998)); *see also* 18 U.S.C. § 2119. Defendants stipulated to the third element of the offense, and do not contest the well proven fact that Eitzen's vehicle was taken from her by force or intimidation within the meaning of the statute. Ex. 46. The Court, thus, need only resolve whether the Government presented sufficient evidence for a reasonable jury to conclude that Defendants did, in fact, take Eitzen's vehicle;

that Defendants did so from the "person or presence of another"; and that Defendants "acted with the intent to cause death or serious bodily harm."

#### a. *The circumstantial evidence supporting the carjacking conviction.*

▮ In their more specific challenges to the presence and intent elements of the offense, Defendants implicitly argue that the Government failed to present sufficient evidence for a reasonable jury to conclude that they stole Eitzen's vehicle. *See* Devan Casteel's Am. Br. at 12–13 (failing to admit Defendants involvement in the robbery); Tiran Casteel's Br. at 12, 14 (similar). The Court disagrees, however, because of the volume of incriminating circumstantial evidence in this case.

The jury heard evidence that on the night of September 11, 2008, two armed men forcibly entered the home of Eitzen, ordered her to sit in a chair after pointing their weapons at her, and proceeded to steal part of her late husband's coin collection before surreptitiously severing her phone line, destroying her cell phone, and stealing her car. Tr. at 152–64. The jury also heard evidence that a large number of collectable coins, including some in packages containing Eitzen's late husband's handwriting, were found in a vehicle linked to Tiran Casteel and in his residence on September 12, 2008.[2] *Id.* at 84–90, 101,

---

**2.** The Court notes that the Government failed to decisively link the Pontiac Bonneville containing the coins to Defendants at trial. At the suppression hearing in case, the Government presented virtually indisputable evidence that Devan Casteel was driving the vehicle and Tiran Casteel was riding in it immediately prior to their arrest and the discovery of the coins. Clerk's No. 164 at 3–4 (Suppression Order). At trial, however, the Government failed to produce a witness that could testify as to who was present in the vehicle prior to its seizure and search. Tr. at 81 ("Q. And were you able to determine who the occupants of the vehicle were? A. The occupants were not with the vehicle when I

searched it."). Despite the Government's seemingly inexplicable oversight, the jury could, nonetheless, associate the vehicle with Tiran Casteel because, during cross examination, the searching agent testified that the coins were found next to a stack of Tiran Casteel's legal papers. Tr. at 101 ("Q. And did you have the opportunity to examine what that paperwork was during the course of your search? A. Yes, I—at the time of the search, yes. Q. And that was paperwork related to a pending lawsuit that Tiran Casteel had against Page County at that time; correct? A. That, I don't recall specifically. I know that there was legal—I believe that there was legal

106–114. The jury additionally heard evidence that the Government found a recently used four-wheeler with a customized muffler that enabled it to run more quietly, a map roughly depicting a cross country route to Eitzen's residence, and other burglary tools during the search of Tiran Casteel's residence. *Id.* at 120–21, 128–29, 313–19, 373–74. The jury further heard forensic evidence indicating that, prior to the robbery, the computer in Tiran Casteel's residence was used to search the internet for information on Eitzen and her late husband and that, approximately an hour after the robbery had ended, it was used to research certain collectible coins. Exs. 4–1 to 4–169 (showing downloaded images of coins); 8 (showing internet searches for "Eitzen"); 40 (showing the internet searches on the morning of September 12, 2008). Finally, the jury heard evidence from Tiran Casteel's paramour that Tiran and Devan Casteel left on a four-wheeler about an hour prior to the robbery on September 11, 2008 and that Tiran Casteel called her later asking if the police had arrived at his residence. Tr. at 491–92. While each piece of circumstantial evidence could have an innocent explanation, as discussed *infra*, the collective strength of this evidence enables a reasonable jury to conclude that Defendants did, in fact, rob Eitzen and steal her vehicle.

b. *The person or presence of another.*

■ The federal carjacking statute does not define the phrase "person or presence of another," and the "dictionary definition is similarly unhelpful." *United States v. Kimble*, 178 F.3d 1163, 1166 (11th Cir.1999). Additionally, the legislative history "provides little aid." *Id.* at 1166–67; *see also United States v. Savarese*, 385 F.3d 15, 19 n. 3 (1st Cir.2004) (concluding "[t]here is no meaningful legislative history with regard to the meaning of 'presence' in the statute"). The phrase, however, "tracks the language used in other federal robbery statutes," *United States v. Lake*, 150 F.3d 269, 272 (3d Cir.1998) (internal citations and quotation omitted), and courts starting in *United States v. Burns*, 701 F.2d 840, 843 (9th Cir.1983), have used those statutes to come to a general consensus as to its meaning. *Savarese*, 385 F.3d at 20 (citing *United States v. Boucha*, 236 F.3d 768, 775 (6th Cir.2001)); *United States v. Edwards*, 231 F.3d 933, 937 (5th Cir.2000); *United States v. Moore*, 198 F.3d 793, 797 (10th Cir.1999); *Kimble*, 178 F.3d at 1168; *Lake*, 150 F.3d at 272. For purposes of the carjacking statute:

> "Property is in the presence of a person if it is so within his reach, observation and control that he could, if not overcome by violence or prevented by fear, retain possession of it. Presence, thus defined, requires a significant degree of nearness without mandating that the property be within easy touch; it must be accessible."

*Savarese*, 385 F.3d at 19 (quoting *Boucha*, 236 F.3d at 775). While not necessarily apparent upon its face, "this interpretation of 'person or presence' from the robbery statutes conforms with both the language and the purpose of § 2119," as this "statute was enacted following a rash of car robberies where the victims were either forced from their cars or robbed just prior to getting into the vehicles." *Kimble*, 178 F.3d at 1167–68.

Defendants assert that the Government cannot satisfy the presence requirement of § 2119 because of the manner in which the robbers stole the vehicle. According to Defendants, the robbers never even mentioned the vehicle in Eitzen's presence and stole it from her driveway without her knowledge. Devan Casteel's Am. Br. at

paperwork in there. As to the specifics of it, I do not recall.").

12–13; Tiran Casteel's Br. at 12 ("In the instant case, the suspects never asked for [Eitzen's] car keys. They never mentioned her vehicle while they were in her presence. She did not know that they had taken her car until approximately 45 minutes after they had left her house."). Defendants argue that this fact distinguishes this case from all previous cases in which courts have affirmed carjacking convictions and precludes the finding of the presence element because the statute was not intended to cover this type of car theft. Tiran Casteel's Br. at 12 ("Extending the scope of the car jacking statute to this set of facts would not be consistent with the purpose of the statute, and would allow application of the statute to an ever-expanding variety of auto thefts." (internal citations omitted)). While the Government implicitly acknowledges that this situation involves a novel application of the carjacking statute, the Government, nonetheless, argues that "[t]he present factual scenario of a car being stolen from just outside the victim's front door while she stayed seated inside after a threat of violence would seem to safely fall within [the] standard." Pl.'s Resistance at 5.

The Court agrees with the Government. Other courts have consistently held that "the presence requirement of the carjacking statute was satisfied when the victim or victims were inside a building and the stolen vehicle was parked outside the building." *Savarese*, 385 F.3d at 20 (collecting cases). Indeed, to satisfy the presence requirement, the Government must merely show "*both* a degree of physical proximity to the vehicle and an ability to control or immediately obtain access to the vehicle." *Id.* (emphasis in the original). In this case, Defendant had both a degree of physical proximity to the vehicle and an ability to immediately obtain access to and control over it because the vehicle was parked in her gravel driveway, which was twenty feet from the residence, and be-

cause the keys to that vehicle were located in her purse, which was in her residence. Tr. at 165, 175. In many respects, the Court finds this case materially analogous to *Moore*, in which the Tenth Circuit found the presence element satisfied when the "keys to the vehicle were in [the victim's] immediate control and had she not been under the control of the defendant and fearful for her life, she could have easily walked out the door to the parking lot and driven away in her car, thus preventing the defendant from taking it." 198 F.3d at 797; *see also Kimble*, 178 F.3d at 1168 ("Wilcher's car was not several miles away, but parked right outside the restaurant. Had Wilcher not been in fear for his safety, he could have reached the car and prevented its taking."). The only arguable distinction is that in this case, the victim was unaware that her car was being stolen; however, the Court cannot discern how the victim's knowledge about the theft bears on the presence element of the offense because the presence element is directed at the victim's proximity to and control over the vehicle, not to the victim's knowledge about the theft. Moreover, assuming, *arguendo*, that a knowledge requirement existed, Eitzen's awareness that two armed men were robbing her would seemingly satisfy any such requirement, even though Eitzen was not immediately aware of the full scope of the theft. Accordingly, the Court believes that the Government presented sufficient evidence for a reasonable jury to conclude that Eitzen's vehicle was stolen from her presence.

c. *The intent to cause death or serious bodily harm.*

In *Holloway v. United States*, the Supreme Court resolved a circuit split as to the meaning of "intent to cause death or serious bodily harm" by holding:

The intent requirement of § 2119 is satisfied when the Government proves that

at the moment the defendant demanded or took control over the driver's automobile the defendant possessed the intent to seriously harm or kill the driver if necessary to steal the car (or, alternatively, if unnecessary to steal the car). 526 U.S. 1, 12, 119 S.Ct. 966, 143 L.Ed.2d 1 (1999). Tracking the language of *Holloway*, the Eighth Circuit subsequently stated:

> When a victim has lost control over her car without the defendant attempting to inflict or actually inflicting serious bodily harm, the government must prove beyond a reasonable doubt that "the defendant would have at least attempted to seriously harm or kill the driver if that action had been necessary to complete the taking of the car."

*Wright*, 246 F.3d at 1127 (quoting *Holloway*, 526 U.S. at 11–12, 119 S.Ct. 966). An "empty threat, or intimidating bluff ... standing on its own, is not enough to satisfy § 2119's specific intent element." *Holloway*, 526 U.S. at 11, 119 S.Ct. 966. As such, the mere presence or brandishing of a firearm cannot alone establish the requisite intent. *Id.* at 12 n. 3, 119 S.Ct. 966 ("In somewhat different contexts, courts have held that a threat to harm does not in itself constitute intent to harm or kill. In *Hairston v. State*, 54 Miss. 689 (1877), for example, the defendant in an angry and profane manner threatened to shoot a person if that person stopped the defendant's mules. The court affirmed the defendant's conviction for assault, but reversed a conviction of assault with intent to commit murder, explaining that 'we have found no case of a conviction of assault with intent to kill or murder, upon proof only of the levelling of a gun or pistol.' *Id.* at 694 ...."); *see also United States v. Adams*, 265 F.3d 420, 424 (6th Cir.2001) ("It is undisputed that Adams threatened each of his six carjacking victims with a gun. We must therefore determine whether sufficient evidence existed from which the jury could have determined that Adams's threats were actual rather than empty, and that they were indicative of his conditional intent to seriously harm or kill his victims.").

Defendants assert that the Government cannot satisfy its burden on the intent element of the carjacking statute for several reasons. Defendants first claim that: "[i]t is impossible for the government to prove the existence of intent at the time of the taking in this case because the government cannot establish when the [Defendants] demanded or took control over the victim's car." Tiran Casteel's Reply at 5. Second, Defendants claim that insufficient evidence exists to reasonably conclude that the robbers had the actual intent to harm Eitzen because:

> In the instant case, no specific threats to kill [Eitzen] were ever communicated. Although she was obviously very frightened because of the presence of two armed men in her home, they did not brandish their weapons at her after their initial entry. [Eitzen] was never struck, tied up, or otherwise restrained beyond the minimal restraint necessary to control her movements while one of the robbers searched the residence for coins.

> Unlike the defendants in the above-cited cases, the defendants in this case never discussed taking [Eitzen's] vehicle. They never discussed taking her keys nor did they ever ask her for her keys. The theft of her vehicle was accomplished by stealth, rather than violence. At most, the government's evidence in this case shows that the taking of [Eitzen's] car was an afterthought. The robbers had accomplished their goal of stealing coins. They had obtained her car keys without her knowing it, therefore, they would have no reason to intend to cause death or serious bodily

harm in order to effectuate the theft of the car. [Eitzen] had been compliant with all of their demands up to that point. They would have had no reason to think that she would disobey their command to remain seated in her chair after they left.

Tiran Casteel's Br. at 13 (record citations omitted); *see also* Devan Casteel's Am. Br. at 13 ("There is no evidence that either of the defendants made any allegation concerning harm to be caused upon Darlene Eitzen if she did not relinquish control of the motor vehicle or its keys. The mere fact that there is an allegation of firearms (which the defendant provided inconsistent testimony on under oath) is not sufficient to infer either [Defendants] intended to kill or cause serious bodily harm to Darlene Eitzen."). Third, Defendants compare this case to both *United States v. Applewhaite*, 195 F.3d 679 (3d Cir.1999), and *United States v. Harris*, 420 F.3d 467 (5th Cir.2005), and claim an insufficient nexus exists between the robbers' intent and the theft of Eitzen's car. Tiran Casteel's Br. at 14–15. Finally, Defendants assert that the testimony of Timothy Blank ("Blank") and Nathan Wilcoxson ("Wilcoxson") is too vague and tenuous to support a carjacking conviction. *See* Tiran Casteel's Reply at 6. The Government resists Defendants' arguments, essentially arguing that the use of force on a "frail 80 plus years of age woman,"[3] in conjunction with the testimony of Blank and Wilcoxson, sufficiently enables a reasonable jury to find the requisite intent.[4] *See* Pl.'s Supp. Resistance at 1–2.

The Court agrees with the Government's conclusion. As an initial matter, the Government must prove the requisite intent at the "precise moment" Defendants' took Eitzen's vehicle to sustain the conviction, which occurred here during the course of the robbery when Defendants seized the keys from her house. *United States v. Garcia–Alvarez*, 541 F.3d 8, 16 (1st Cir. 2008) ("In Garcia's case, the 'taking' of the motor vehicle occurred in the apartment building's basement, when Lopez was forced to turn over his car keys. It was at that point that the assailants gained constructive control over Lopez's car." (citations omitted)). Since the exact time of taking of Eitzen's keys is unknown in this case, the Court believes that the conviction can stand so long as the Government presented sufficient evidence for the jury to conclude that Defendants possessed the requisite intent during the *entire* robbery, which the Government has done.

The jury heard evidence that Defendants pointed a firearm at Eitzen before giving her orders to first sit in a chair, then move to the kitchen, and finally to remain in the chair while they left. Tr. at 157, 162–64. The jury additionally heard

---

**3.** The Court notes that, at the time of the robbery, Eitzen was neither 80 nor particularly frail. *See* Clerk's No. 157 at 35 (Suppression Hearing Transcript).

**4.** The Government also argues that Eitzen's subjective belief that she would be harmed if she resisted supports the jury's verdict. Pl.'s Supp. Resistance at 2 ("However, as set forth in the governments original Resistance Brief on the subject of 'force and intimidation' and by *Holloway* and *Williams*, the defendants had planted the seed of harm in her head, i.e., 'conditional intent' by their activities to such an extent that she believed she would be harmed if she intervened in the theft."). The Court does not accept this argument, however, because the subjective conclusions of a victim are irrelevant. *United States v. Fulford*, 267 F.3d 1241, 1244 (11th Cir.2001) ("The defendant's intent is to be judged objectively from the visible conduct of the actor and what one in the position of the victim might reasonably conclude." (internal quotations and citations omitted)); *see also United States v. Guthrie*, 557 F.3d 243, 252 (6th Cir. 2009) (same). Indeed, the Court only considers the facts underlying the victim's conclusions.

evidence that one of the Defendants remained with Eitzen and held a firearm to his side during the course of the robbery. *Id.* at 158. The jury further heard evidence from Blank and Wilcoxson that Defendants were prepared to use force should the robbery not occur as planned. *Id.* at 337 (Blank testifying that in April or May of 2008, Defendant Tiran Casteel attempted to recruit him to rob Eitzen and stated they would kill her if they said any names or were recognized during the robbery), 447–48 (Wilcoxson testifying that he went on a "dry run" of the robbery of Eitzen with both Defendants and that his job was to restrain Eitzen and "pistol-whip her" should she resist). While the Court believes the Government's evidence is precarious, especially given Defendants' decision not to hurt Eitzen after she briefly resisted by telling them to "stop it" during the initial entry, the Court nonetheless believes that the Government has presented minimally adequate evidence that Defendants conditionally intended to either seriously injure or kill Eitzen should she have resisted the robbery, which included the theft of her vehicle. *Id.* at 153.

In coming to this conclusion, the Court necessarily rejects Defendants' attempts to rely on *Applewhaite* and *Harris*. In *Applewhaite*, Applewhaite and his co-defendant paramour plotted the murder of the paramour's ex-husband. 195 F.3d at 682. After luring the victim to the paramour's house, Applewhaite knocked the victim unconscious with "three blows from behind," put him in the victim's vehicle, and drove away. *Id.* The victim awoke in the back of the van, and in the ensuing struggle to regain control of the vehicle, Applewhaite shot the victim. *Id.* at 683. Applewhaite was later charged and convicted of carjacking under § 2119. The Third Circuit reversed the conviction on sufficiency grounds, however, because the Government failed to show that Applewhaite in-

tended to harm the victim in furtherance of vehicle theft, stating:

> Here, it is clear that the required scienter was never established. Although the defendants clearly intended to seriously harm or kill Eddie Romero, neither their evil intent, nor the force they employed in furtherance of it, had any nexus to the subsequent taking of his van. The force was employed in an attempt to harm Eddie Romero. It was not used to take his van.

*Id.* at 685. In other words, the Third Circuit reasoned that "unless the threatened or actual force is employed in furtherance of the taking of the car, there is no carjacking within the meaning of 18 U.S.C. § 2119" because the Government cannot satisfy the *mens rea* requirement. *Id.* at 686.

In *Harris*, the Fifth Circuit similarly interpreted § 2119 to require the Government to show a nexus between the requisite criminal intent and the theft of a vehicle. In that case, the Circuit overturned a carjacking conviction because the Government could only show that Harris used the vehicle to escape from the murder scene, not that he murdered the victim in order to take the victim's vehicle. *Harris*, 420 F.3d at 467. In the Circuit's own words:

> Here, as in *Applewhaite*, it is uncontested that Harris took Ceniceros's car after Ceniceros was shot. But that does not establish that the force was used to get control of the car. Thus, here just as in *Applewhaite*, the prosecution failed to establish the required nexus between the intent to kill or harm and the taking of the car. Although intent to kill or harm may be reasonably inferred from the evidence of violence or threat present in both cases (here, due to the shooting), the element of contemporaneousness between the taking and the intent to kill or harm cannot be shown when no

evidence exists in the record to reasonably determine that element beyond a reasonable doubt. Here, reasonable inferences from the evidence adduced against Harris in no way resolve whether the taking of the car was a mere afterthought to the killing of Ceniceros, or whether at the precise moment the car was taken, Harris intended to kill or harm Ceniceros if necessary to steal the car.

*Id.* (internal quotations and citations omitted).

The Court believes that *Applewhaite* and *Harris* are easily distinguishable on their facts and that the underlying holdings in each of the cases supports the Court's conclusion here. In both *Applewhaite* and *Harris*, the convictions were overturned because the government could not establish that the taking of the vehicle related to the intent to harm the victim. At most, the government established that the vehicle thefts were mere "afterthoughts." *Applewhaite*, 195 F.3d at 685 ("Rather, the record establishes that the van was taken as an afterthought in an attempt to get Romero's limp body away from the crime scene."); *Harris*, 420 F.3d at 467 (similar). This is not the case here. As the Court previously explained, Defendant took Eitzen's vehicle *during* the course of the robbery, when they stole her keys. *See Garcia–Alvarez*, 541 F.3d at 16. During this time period, Defendants possessed the intent to harm or kill Eitzen should she resist any aspect of the rob-

bery, which included not only the theft of her late husband's coin collection but also the theft of her vehicle. The mere fact that Defendants' ultimate purpose in the robbery was not to steal her vehicle is of no consequence because they knowingly took the vehicle and intended to harm her if she resisted. *See id.* ("Finally, and in direct response to Garcia's 'getaway vehicle' argument, we have previously said that nothing in the statute requires that the taking of a motor vehicle be an ultimate motive of the crime. It is enough that the defendant be aware that the action in which he is engaged involves the taking of a motor vehicle." (internal quotation and citations omitted)). Accordingly, the Court believes that the Government established the requisite nexus in this case. As such, the Court rejects Defendants' challenges to the carjacking convictions, as well as the challenges to the derivative § 924(c) convictions.

### 2. *Obstruction of Justice.*

In order to sustain a conviction for obstruction of justice under the facts of this case, the Government must have proven beyond a reasonable doubt: (1) Tiran Casteel threatened the life of Eitzen, who was scheduled to testify for the government in a criminal trial against him; (2) he knew that the criminal trial was pending; and (3) by threatening the witness, he corruptly endeavored to influence and obstruct the due administration of justice. *See* 18 U.S.C. § 1503.[5] Tiran Casteel stipulated

---

**5.** Title 18 U.S.C. § 1503 states in relevant part:

Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty,

or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate judge, or other committing magistrate in his person or property on account of the performance of his official duties, or *corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due adminis-*

to the second element of the offense at trial, thereby leaving the Court to consider only whether Tiran Casteel threatened Eitzen and whether he engaged in an endeavor. Ex. 48 (stipulation).

### a. *Tiran Casteel's threat.*

 A threat is "a communicated intent to inflict harm or loss on another." Black's Law Dictionary 1519 (8th ed. 2004); *see also United States v. Jongewaard,* 567 F.3d 336, 340 (8th Cir.2009) (stating while interpreting 18 U.S.C. § 875, which proscribes threatening interstate communications: "Rather, a statement constitutes a threat if it expresses an intention to inflict harm, loss, evil, injury, or damage on another, regardless of whether the person making the threat has a discernible purpose for communicating such an intention"). "Whether a particular statement may properly be considered to be a threat is governed by an objective standard—whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault." *United States v. Schiefen,* 139 F.3d 638, 639 (8th Cir.1998) (internal citations and quotations omitted, interpreting the meaning of threat within mostly the context of 18 U.S.C. § 115, which proscribes threatening various federal officials). For a statement to constitute a threat, it must merely be expressed to another individual, even if that individual is not the intended victim, unless the governing statute mandates otherwise, which § 1503 does not. *See* 18 U.S.C. § 1503; *United States v. England,* 507 F.3d 581, 589 (7th Cir.2007)

(stating while interpreting the meaning of threat under 18 U.S.C. § 1512, which proscribes with witness tampering: "An 'expression' only requires that someone—not necessarily the intended victim—perceive it. Adding a requirement that the would-be victim himself actually perceive the threat would graft on an additional 'receipt' element that the statute's text does not require.").

Tiran Casteel argues: "The government's proof was insufficient to establish beyond a reasonable doubt that the defendant communicated any threat to kill [Eitzen]." Tiran Casteel's Br. at 16. In support of his argument, he claims:

> The alleged threats involved in this case are highly ambiguous. They required Nathan Wilcoxson, the son of the defendant's estranged paramour, to interpret phrases such as "pistol whipping poodle" and "Julie Jones all the way." [Eitzen] was never mentioned specifically in any of these communications. Although Wilcoxson says that he deduced that "poodle" referred to [Eitzen], he never explained what those deductions were based upon. Similarly, although he says he eventually determined that the references to "Julie Jones" somehow signified that he was supposed to make it look like [Eitzen] had accidentally fallen down the stairs and broken her neck, he never explained how he had arrived at that interpretation.

*Id.* at 16–17. Tiran Casteel also claims that the objective reasonableness of the threat was undermined by the fact that "no threat was successfully communicated to [Eitzen]." *Id.* at 17. The Government

---

*tration of justice,* shall be punished as provided in subsection (b). . . .
(emphasis added). While this statute does not explicitly refer to threatening witnesses, the Eighth Circuit has held that its residual clause proscribes such conduct. *United States v. Risken,* 788 F.2d 1361, 1367–68 (8th Cir.

1986) (holding that the omnibus clause of § 1503 still criminalizes threatening witnesses even after Congress removed the word witness from the statute in 1982, stating: "We agree and hold that witness tampering is punishable under § 1503").

essentially failed to respond to these arguments, claiming a "threat is a threat, regardless of any obfuscation involved." Pl.'s Br. at 11. Nevertheless, the Court believes Tiran Casteel communicated a sufficient threat.

The jury heard and saw strong evidence that Tiran Casteel was attempting to arrange the murder of Eitzen through Wilcoxson. The jury heard numerous portions of a recorded phone conversation between Tiran Casteel and Wilcoxson, in which Tiran Casteel stated: "Something got to take place with this bitch.... Do you remember Julie Jones; what happened to her.... I got to do something serious Nathan because you know what I mean. I have got to get something taken care of...."; "Pistol-whipping poodle ... Everybody has a right, you know what I mean?"; "The only thing I have to do is have that old lady fall over dead from a f* * *ing heart attack, and then I can be out of here."; "But we've got a lot of tricks up our sleeves, you know what I mean, that we are doing, but I need somebody out there that can take care of business my way."; and "Everybody has a right to face their accuser, ... if she doesn't show up on the stand, they have to drop my charge." Ex. 45. According to Wilcoxson, the term "poodle" referred to Eitzen and "Julie Jones" referred to a individual who was "pushed down the stairs by her husband and [ ] died of a broken neck." Tr. at 433. Wilcoxson testified that he understood this conversation to mean that Tiran Casteel wanted him to "somehow get into [Eitzen's] house and have her accidentally fall down the stairs and die so that it would look like an accident." Id. at 434.

The jury also saw two incriminating letters that Tiran Casteel wrote to Wilcoxson. In the first letter, Tiran Casteel wrote: "Talk to Jon [not legible] and you, I want pistol whip done. Julie Jones all the way. Don't tell the girls." Ex. 22. Wilcoxson testified that this phrase meant he was to "[t]alk to a few people to get the pistol whip [done],[6] or Julie Jones, make sure she falls. Pretty much make sure she can't come to court. Don't tell the girls, don't tell the women anything because you can't trust them." Tr. at 434–35. The letter also stated: "Get something set up for me Re: 'Pistol Whip Poodle' ASAP," which has essentially the same meaning. Ex. 22; Tr. at 435. In the next letter, Tiran Casteel wrote: "Let me know. Kyle may call on poodle deal. Tell him talk in person. 10 to 20 grand for cash settlement." Ex. 23. According to Wilcoxson, this statement meant that "Kyle would get 10 to 20 thousand dollars to take care of the poodle." Tr. at 435–36. The letter also stated: "Get Kyle and Jon to meet you and talk about poodle ok," which meant that Wilcoxson was supposed to "[g]et a couple guys to do it, like was talking about [previously], except for now two guys." Ex. 23; Tr. at 436. The letter finally stated: "If ya hook up w/ Kyle Jon, get hand writtin [sic] statement from poodle, and sign and then kick poodle's ass." Ex. 23. Wilcoxson testified that this statement meant: "Go out there and get a statement from her ['that she lied to the cops about the coins'] and then, like, force her to write a statement, and then hurt her." Tr. at 436.

While each of Tiran Casteel's statements is fairly ambiguous and vague in isolation, the Court believes that when viewed as a whole, they unequivocally reveal a straightforward plan to force Eitzen to

---

**6.** In the transcript of the trial, the court reporter erroneously transposed the word gun for done. This appears to be a simple scrivener's error, as the letter states done and the Court recalls the witness saying done. Accordingly, the Court has corrected the transcript.

recant her testimony before killing her. The mere fact that Wilcoxson did not fully explain the basis for his interpretation of Tiran Casteel's statements is immaterial because of the collective strength of Tiran Casteel's own words. Accordingly, since Defendant communicated this plan to Wilcoxson and since a reasonable person would interpret the statements as a serious expression of Tiran Casteel's intent to harm Eitzen, the Court finds that Tiran Casteel threatened Eitzen within the meaning of the statute.

### b. *Tiran Casteel's endeavor.*

According to the Supreme Court, "the term 'endeavor' [has] a useful function to fulfill: It makes conduct punishable where the defendant acts with an intent to obstruct justice, and in a manner that is likely to obstruct justice, but is foiled in some way." *United States v. Aguilar*, 515 U.S. 593, 601–02, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995). The statutory requirement of an endeavor, thus, imposes a nexus requirement whereby "the act must have a relationship in time, causation, or logic with the judicial proceedings. In other words, the endeavor must have the natural and probable effect of interfering with the due administration of justice." *Id.* at 599, 115 S.Ct. 2357 (internal quotations and citations omitted). However, an act need not be successful in impeding the administration of justice to constitute an endeavor. *Id.* ("This is not to say that the defendant's actions need be successful; an 'endeavor' suffices.") (citing *United States v. Russell*, 255 U.S. 138, 143, 41 S.Ct. 260, 65 L.Ed. 553 (1921)). Indeed, the act need not even rise to the level of an attempt for it to be considered an endeavor. *United States v. Buffalano*, 727 F.2d 50, 53 (2d Cir.1984) ("In [*Russell*, 255 U.S. at 143, 41 S.Ct. 260], the Supreme Court defined 'endeavor,' while discussing the statute's predecessor, as 'any effort or essay to accomplish the evil purpose that the section was enacted to prevent.' By using such term Congress purged from the statute the technicalities associated with distinguishing between preparation for an attempt and the attempt itself. *Id.* The conclusion is that an 'endeavor' under § 1503 does not require proof that would support a charge of attempt, i.e., an 'endeavor' is less than an attempt.").

Tiran Casteel asserts that his actions do not constitute an endeavor. He principally argues that his communications with Wilcoxson could not have the natural and probable effect of interfering with the due administration of justice because it was not reasonable for him to believe Wilcoxson would act upon his requests, stating more specifically:

The evidence of an endeavor is also lacking. Although the government is not required to prove that the endeavor was successful, the government must prove that the endeavor had at least a reasonable tendency to obstruct the due administration of justice. (Final Jury Instruction No. 10). It was simply not reasonable for the defendant to believe that Nathan Wilcoxson would carry out any requests to interfere with the testimony of [Eitzen]. Wilcoxson testified that he never had any intention of doing so, and did not, in fact, take any action in response to the defendant's perceived requests. (Tr., p. 463). He thought it was merely a fantasy of the defendant's that something could be done to prevent [Eitzen] from testifying. (Tr., p. 464).

Tiran Casteel's Br. at 17. Tiran Casteel also argues, in an attempt to distinguish case law, that the purported threat was too attenuated from the intended victim for it to satisfy the nexus requirement, stating additionally:

In *Aguilar*, though, the judge lied directly to an F.B.I. agent, while here, the defendant's alleged threats against the

victim were made to third parties. One of those third parties was the son of defendant's estranged girlfriend, who had a long list of grievances against the defendant, and another was a jail inmate who, in turn, would have to obtain the assistance of someone outside of jail to carry out the threats against the victim. If anything the defendant's threats were more attenuated from the due administration of justice than the judge's lies to the F.B.I. The government cites *United States v. Joiner*, 418 F.3d 863 (8th Cir.2005) as a good example of its attenuation argument. There, the defendant filed false UCC financing statements against the Assistant United States Attorney who prosecuted him at the trial court level. *Id.* at 868. There again, the defendant's conduct reached the prosecutor directly, rather than going through an intermediary as in the instant case. In *Joiner*, the court certainly acknowledged the existence of the requirement that there must be a nexus between the defendant's conduct and an intent to impede the administration of justice. 418 F.3d at 868.

Tiran Casteel's Reply at 6–7. In contrast, the Government argues that a sufficient nexus exists because the threatening communication was not too attenuated. *See* Pl.'s Resistance at 12–14.

The Court agrees with the Government's conclusions and believes that Tiran Casteel is misconstruing the *Aguilar* nexus requirement in light of compelling jurisprudence from the Seventh and Second Circuit. In *United States v. Muhammad*, the Seventh Circuit upheld the conviction of a defendant under § 1503 for endeavoring to impede the due administration of justice by attempting to sell his jury vote. 120 F.3d 688, 691 (7th Cir.1997). At the time of the offense, Muhammad was sitting on a civil jury, and he attempted to solicit a bribe from one of the parties. He failed, however, because that party contacted the FBI, which arranged a sting operation. *Id.* at 691–92. The evidence adduced at trial against him "showed that Muhammad contacted Cumberland on two occasions to solicit the bribe, he discussed a bribe with Cumberland's attorney, he agreed to receive $2,500 from an undercover agent posing as a Cumberland employee, and he offered to sway the jury in exchange for the $2,500." *Id.* at 695. Muhammad challenged his conviction, in part, by arguing "that his telephone conversations discussing the bribe did not have the natural and probable effect of interfering with the jury deliberations" because he was removed from the jury. *Id.* at 694. To support his argument, Muhammad attempted to rely on *Aguilar*, where the Supreme Court "held that a defendant did not knowingly obstruct justice even though he provided false statements to an investigating agent and he was aware of a related, pending grand jury proceeding" because "even though the defendant knew of the grand jury proceeding, there was no evidence that his statement would be provided to the grand jury." *Id.* at 695 (citing *Aguilar*, 515 U.S. at 599–601, 115 S.Ct. 2357). In rejecting his challenge, the Seventh Circuit stated:

> Muhammad's argument misconstrues *Aguilar*'s holding. *Aguilar* did not state that a defendant's actions must have the natural and probable effect of obstructing justice. Rather, the case holds that a defendant's actions must demonstrate his intent to do something that has the natural and probable effect of obstructing justice[.]

*Id.* The defendant was, thus, liable because his act of soliciting demonstrated an underlying intent to engage in conduct that would have the natural and probable effect of impeding justice, even though the acts he committed in furtherance of that plan had no such effect and could not succeed. *Id.* at 695 ("The very purpose behind Mu-

hammad's actions was to pervert the integrity of that judicial proceeding. Thus, even though Muhammad could not have affected the Favala jury's verdict because his arrest effectively removed him from that jury, his promise to influence the jury's decision in return for $2,500 plainly illustrates his culpability."). The Second Circuit has also adopted a similar interpretation of Aguilar, stating "the conduct offered as proof of the intent to obstruct a federal proceeding must, in the defendant's mind, have had the natural and probable effect of obstructing the proceeding." *United States v. Bruno,* 383 F.3d 65, 67 (2d Cir.2004) (internal quotations and citations omitted).

In the absence of any countervailing Eighth Circuit precedent, the Court adopts the Seventh and Second Circuits' persuasive interpretation and finds that a sufficient nexus exists in this case.[7] Tiran Casteel essentially solicited Wilcoxson to facilitate and perhaps to participate in an attempt to fabricate a recantation by Eitzen and to kill her so that she could not testify at trial. Tr. at 434–36; Exs. 22, 23, 45. His solicitations reveal an intent to engage in a course of conduct that had the natural and probable effect of obstructing justice because Tiran Casteel's plan was seemingly feasible. Indeed, while not fully developed, Tiran Casteel's scheme to have essentially his step-son assist him in hiring individuals to use force to prevent Eitzen from attending trial has a conceptually strong potential for success. The mere fact that Wilcoxson never had any intention of carrying out Tiran Casteel's

requests is immaterial because the Court focuses only on whether a defendant "intend[ed] to do something that has the natural and probable effect of obstructing justice." *Muhammad,* 120 F.3d at 695. Wilcoxson's subjective intent is as irrelevant as the undercover agent's intent was in *Muhammad. Id.* Likewise, the fact that Tiran Casteel did not make the threat directly to Eitzen and that Eitzen did not readily learn of it is of no consequence because the Court focuses only on a defendant's actual intent and the likely effect of the intended course of conduct. *Id.* Finally, Tiran Casteel's remaining argument— that he could not have reasonably believed Wilcoxson would accept his solicitation— belies the facts of this case, if not the governing standard. Tiran Casteel's belief that Wilcoxson would assist him was ostensibly reasonable because Wilcoxson was basically a family member, who had already participated in a dry run of the robbery and who had historically been intimidated into obedience by Tiran Casteel. Tr. at 447–48, 485 ("Q. Nathan [Wilcoxson], were you more afraid of going to jail or Tiran? A. I didn't like either option, but I would be more afraid of Tiran."). Consequently, the Court rejects Tiran Casteel's arguments and finds a sufficient endeavor.[8] Accordingly, the Court rejects Tiran Casteel's challenge to his conviction under 18 U.S.C. § 1503.

### 3. *Tampering with a Witness by Attempting to Kill.*

 In order to sustain a conviction for witness tampering under the facts of

---

7. The Court notes that the Eighth Circuit did not directly consider this issue in any of the four cases it has decided in the wake of *Aguilar. See United States v. Joiner,* 418 F.3d 863 (8th Cir.2005); *United States v. Russell,* 234 F.3d 404 (8th Cir.2000); *United States v. Novak,* 217 F.3d 566 (8th Cir.2000); *United States v. Lefkowitz,* 125 F.3d 608 (8th Cir. 1997).

8. The Court notes its conclusion would remain unaltered even if the underlying act itself were required to have the requisite natural and probable effect because it was reasonable for Tiran Casteel to expect Wilcoxson to try and effectuate his seemingly feasible plan.

this case, the Government must have proven both that Tiran Casteel knowingly attempted to kill Eitzen and that Tiran Casteel did so with the intent to prevent her from testifying in his criminal case. *See* 18 U.S.C. § 1512(a)(1)(A).[9] An attempt requires "(1) an intent to engage in criminal conduct, and (2) conduct constituting a substantial step toward the commission of the substantive offense which strongly corroborates the actor's criminal intent." *United States v. Lucas*, 499 F.3d 769, 781 (8th Cir.2007) (en banc) (internal citations and quotations omitted).

"A substantial step must be something more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime.... In order for behavior to be punishable as an attempt, it need not be incompatible with innocence, yet it must be necessary to the consummation of the crime and be of such a nature that a reasonable observer, viewing it in context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute."

*United States v. Mims*, 812 F.2d 1068, 1077 (8th Cir.1987) (quoting *United States v. Mazzella*, 768 F.2d 235, 240 (8th Cir. 1985)). In other words, " 'a substantial step is conduct such that if it had not been extraneously interrupted would have resulted in a crime.' " *United States v. Williams*, 136 F.3d 547, 553 (8th Cir.1998) (quoting *United States v. Carlisle*, 118 F.3d 1271, 1273 (8th Cir.1997)). "Whether a defendant's conduct constitutes a substantial step depends on the particular circumstances of the case." *Mims*, 812 F.2d at 1077 (citing *United States v. Joyce*, 693 F.2d 838, 841 (8th Cir.1982)).

Tiran Casteel argues that the Government never proved he took a substantial step. He claims: "At most, the defendant's conduct, both with respect to his communications with Nathan Wilcoxson and his conversations with Anthony Formaro, constitute mere preparation.... The defendant cannot be punished for wishing that a witness would not show up or would testify differently than anticipated." Tiran Casteel's Br. at 18. In response, the Government argues that "case law in this area indicates that mere verbal discussion may be sufficient to constitute a substantial step for an attempt crime, if the discussion is definite enough," which it was here because Tiran Casteel "may not have had the chance to figure out the specifics, such as payment or location of the hit, but it still seems clear that his desire to kill [ ] Eitzen was unwavering until his plotting came to light." Pl.'s Resistance at 17–21. Tiran Casteel resists the Government's argument by stating that Eighth Circuit jurisprudence is internally inconsistent on what constitutes an attempt and that it is hard to reconcile cases such as *Mims* with the Circuit's earlier decision in *Joyce*, which presumably would undercut the Government's arguments. Tiran Casteel's Reply at 8–9 ("Although the cases cited by the government do stand for that proposition, they are very difficult to reconcile with *United States v. Joyce* [ ]."). The Court agrees with the Government.

In *Joyce*, Joyce flew from Oklahoma City to St. Louis to meet with an informant and an undercover officer posing as a cocaine seller. 693 F.2d at 840. The undercover officer and Joyce agreed on a price, but Joyce refused to show the officer his money until the package was opened.

**9.** Title 18 U.S.C. § 1512(a)(1)(A) provides: "Whoever kills or attempts to kill another person, with intent to prevent the attendance or testimony of any person in an official proceeding ... shall be punished," as set forth in the statute.

*Id.* When the officer refused to open the package, in accordance with DEA policy, Joyce left without making a purchase and with "no apparent intention of returning at a later time to purchase any cocaine." *Id.* Joyce was subsequently arrested and convicted of attempting to purchase cocaine. *Id.* On appeal, the Eighth Circuit reversed his conviction, finding:

> Whatever intention Joyce had to procure cocaine was abandoned prior to the commission of a necessary and substantial step to effectuate the purchase of cocaine. The attempt, of course, need not be successful, but generally the abortion of the attempt occurs because of events beyond the control of the attemptor. As the court recognized in [*United States v. Monholland*, 607 F.2d 1311, 1319 (10th Cir.1979),] "the attemptor's act must have passed the preparation stage so that if it is not interrupted extraneously, it will result in a crime." *Also see Mims v. United States*, 375 F.2d 135, 148 n. 40 (5th Cir.1967); *People v. Miller*, 2 Cal.2d 527, 42 P.2d 308, 309 (1935). Here it is undisputed that Joyce, despite having both the opportunity and ability to purchase the cocaine at the agreed upon price, unambiguously refused either to produce his money or to purchase the cocaine. This effectively negated the government's effort to consummate the sale.

*Id.* at 841–42. In other words, the Eighth Circuit only found "a preliminary discussion regarding the purchase of cocaine which broke down before Joyce had committed any overt act adapted to, approximating, and which in the ordinary and likely course of things would result in the commission of the crime of possessing cocaine with the intent to distribute." *Id.* at 842 (internal quotation and citation omitted).

In *Mims*, the Eighth Circuit upheld a conviction for attempting to use a telephone to facilitate the commission of a drug offense for a defendant who only solicited narcotics from an unwilling party over the telephone. 812 F.2d at 1077–78. In so doing, the Circuit distinguished *Joyce* on the basis of who prevented the commission of the underlying crime, stating:

> Unlike *Joyce*, in the present case it was Sage, rather than [the defendant], who ended the negotiations. It is clear from at least the last three phone conversations that [the defendant] had done all he could to obtain heroin short of getting Sage to agree to sell it to him. In each of these calls, [the defendant] contacted a known source of heroin and tried to negotiate a deal. [The defendant] repeatedly offered Sage definite sums of money in exchange for the heroin. He also indicated that he had secured increasingly larger sums of money to enable him to deal with Sage. It was only because Sage refused to deal with [the defendant] that [the defendant] was not successful in his endeavors. On that basis, this case is distinguishable from *Joyce*.

*Id.* at 1078. Since *Mims*, the Eighth Circuit has consistently held that under *Joyce* and its progeny, the determination of whether a substantial step exists hinges on who ended the chain of events that would, in the ordinary and likely course of things, lead to the commission of a substantive offense. *United States v. Spencer*, 592 F.3d 866, 878 (8th Cir.2010) ("*Joyce* and subsequent decisions 'turned on whether it was the defendant himself—rather than a third party—who ended the chain of events leading toward, but not resulting in, the commission of a substantive crime.'") (quoting *United States v. Burks*, 135 F.3d 582, 584 (8th Cir.1998)).

Applying this standard, the Court finds that Tiran Casteel took a substantial step toward killing Eitzen in his correspon-

dence with Wilcoxson. Tiran Casteel solicited Wilcoxson to assist him in murdering Eitzen. Ex. 22 ("Talk to Jon [not legible] and you, I want pistol whip done. Julie Jones all the way."). Tiran Casteel also provided Wilcoxson with specific instructions on who to recruit and how to negotiate with at least one of them. *Id.*; Ex. 23 ("Let me know. Kyle may call on poodle deal. Tell him talk in person. 10 to 20 grand for cash settlement."; "Get Kyle and Jon to meet you and talk about poodle ok."). Tiran Casteel further provided instructions on how the murder was to occur, namely by forcing Eitzen to recant before executing her. Ex. 23 ("If ya hook up w/ Kyle Jon, get hand writtin [sic] statement from poodle, and sign and then kick poodle's ass."). While the record contains no further evidence regarding the logistics of Tiran Casteel's scheme, the Court is convinced that he embarked on a path that would have likely resulted in the death of Eitzen, but for the refusal of Wilcoxson to cooperate. Indeed, this situation is materially analogous to *Mims*, in which the feasible plan of the defendant was only thwarted by an unwilling party, who refused to act on the defendant's many solicitations. 812 F.2d at 1078–79. Accordingly, the Court denies both Defendants' Motions for Judgment of Acquittal.[10]

### B. *Motion for New Trial*

Federal Rule of Criminal Procedure 33 provides: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." The district court is granted broad discretion in passing upon motions for new trial, and its decision is subject to reversal only for a clear abuse of discretion. *See United States v. Bass*, 478 F.3d 948, 951 (8th Cir.2007) ("A district court's 'determination that a new trial should be granted on the ground that the

verdict is against the weight of the evidence is entitled to great deference and is reversible only upon a strong showing of abuse.' ") (quoting *King v. Davis*, 980 F.2d 1236, 1237 (8th Cir.1992)). Unlike a motion made for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, the Court need not consider the evidence on a Rule 33 motion for new trial in the light most favorable to the Government. Rather, in assessing whether Defendant is entitled to a new trial on the ground that the verdict is contrary to the weight of the evidence, "the district court weighs the evidence and evaluates anew the credibility of the witnesses to determine if a miscarriage of justice may have occurred." *Davis*, 103 F.3d at 668; *United States v. Lanier*, 838 F.2d 281, 284–85 (8th Cir.1988) (per curiam). As the Eighth Circuit Court of Appeals explained in *United States v. Rodriguez:*

"When a motion for a new trial is made on the ground that the verdict is contrary to the weight of the evidence, the issues are far different from those raised by a motion for judgment of acquittal. The question is whether he is entitled to a new trial. In assessing the defendant's right to a new trial, the court must weigh the evidence and in doing so evaluate for itself the credibility of the witnesses." *United States v. Lincoln*, 630 F.2d 1313, 1316 (8th Cir.1980). The court will only set aside the verdict if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred. We will not reverse the district court's decision absent a clear and manifest abuse of discretion. *United States v. Bonadonna*, 775 F.2d 949, 957 (8th Cir.1985); *United States v. Ferguson*, 776 F.2d 217, 225

---

**10.** Given its conclusion, the Court does not believe it is necessary to delve into the remaining conversations Defendant had with Anthony Formaro.

(8th Cir.1985); *United States v. Bohn,* 508 F.2d 1145, 1150 (8th Cir.1975). 812 F.2d 414, 417 (8th Cir.1987). The Eighth Circuit has also warned that the authority to grant a Rule 33 motion for new trial "should be used sparingly and with caution." *Lincoln,* 630 F.2d at 1319. Nonetheless, if the Court finds that " 'despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, [the district court] may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.' " *United States v. Huerta–Orozco,* 272 F.3d 561, 565 (8th Cir.2001) (quoting *Lincoln,* 630 F.2d at 1319). The district court's discretion in determining that a new trial is warranted "is abused if it does not take into account a matter that should have been given significant weight, gives significant weight to something improper or irrelevant, or 'commits a clear error of judgment.' " *Bass,* 478 F.3d at 951 (quoting *United States v. Dodd,* 391 F.3d 930, 934 (8th Cir.2004)).

▬ Defendants assert numerous grounds for a new trial. Both Defendants argue that the Court made various erroneous evidentiary rulings and Devan Casteel argues that Court improperly joined him with Tiran Casteel for trial. Devan Casteel's Am. Br. at 15–18; Tiran Casteel's Br. at 19. Both Defendants also assert that the verdicts on the carjacking and derivative firearms charges are against the weight of evidence. Devan Casteel's Am. Br. at 15; Tiran Casteel's Br. at 19–25. The Court need only address the Defendants' weight argument because the Court has already ruled on the remaining arguments and, after having reviewed the record anew, can find no material error in its prior decisions.

Tiran Casteel efficiently summarizes the weaknesses in the Government's evidence when he states in his brief:[11]

No one identified the defendant as one of the robbers. There is no physical evidence in the form of fingerprints or DNA connecting the defendant to either the crime scene or [Eitzen's] automobile. There was no evidence that the defendant confessed guilt to any police officers.

The case against the defendant was entirely circumstantial.... The government also presented the testimony of Timmy Blank. Blank testified that in April or May of 2008, the defendant told him that he knew some people who had some old coins and gold that he wanted to steal. He said he would use a four-wheeler and a four-wheeler trailer, enter their residences, hold them at gunpoint, and put safes and other property on the trailer for the four-wheeler. He also said that Casteel told him that he planned on taking the cell phones of the victims and tying them up and then calling the police. Blank has at least two prior felony convictions. At the time of his testimony he was incarcerated pending federal charges. He was also serving a 10–year state sentence on a criminal mischief charge that involved him doing $50,000 in damage to a local business....

In addition to calling Nathan Wilcoxson to interpret letters and phone calls from the defendant, Nathan also testified that he had participated in a "dry run" with the defendant and Devan Casteel. He said they had masks, and a $CO_2$ power

---

11. Tiran Casteel makes further arguments regarding the Government's other evidence in this case; however, the Court believes it is unnecessary to include these arguments because the Court's analysis does not hinge on that evidence. *See* Tiran Casteel's Br. at 20–26.

pistol with them when they went to [Eitzen's residence]. Nathan claims that he was supposed to pistol whip [Eitzen] if she resisted. Wilcoxson never told anyone this story until the morning of the day he testified. His rather nonsensical explanation for the failure to divulge this critical information was that he was afraid of Tiran Casteel. It would seem more logical that if he was afraid of Tiran Casteel that he would have divulged this information at the earliest possible opportunity in order to ensure that Casteel would not get out on pretrial release, and to help the government make its case against Casteel. It was apparent from Wilcoxson's testimony that he deeply resents the way he was treated by Tiran Casteel while he and his mother were living with Casteel.... Wilcoxson [also] admitted to lying to agent Hampton on a number of occasions, and also said that he lied to FBI agent Atwood in February 2009 when he falsely told Atwood that he did not understand the reference to "Julie Jones" in the defendant's letters and phone calls.

Nathan Wilcoxson's mother, Anna Dawn Hutt, was another witness who repeatedly lied to law enforcement officers when she denied knowing anything about Tiran's activities on the evening of September 11th. On November 4, 2009, Anna Hutt told law enforcement officers for the first time that she observed Tiran Casteel and Devan Casteel sitting on the four-wheeler at approximately 10–10:30 p.m. When she asked the defendant what he was doing, he told her to "mind my own f-in business." She testified that after being dismissed by the defendant she went back inside the house, and fell asleep. She was awakened again when Tiran Casteel called and asked if she had seen any police outside. She does not know what time that call occurred. She testified that

she had spoken to agent Darren Hampton on a number of occasions before she disclosed her story about seeing Tiran and Devan on the four-wheeler on the night of September 11th.

Ms. Hutt had a strong motive to lie about the defendant. Their relationship has always been very difficult, with the defendant trying to control such things as when she goes to bed, and whether her children may visit her. The defendant actually had posted written rules against having her children over at their house. This is particularly painful to her because her first grandchild, Nathan's son, was born on September 11, 2008. After Tiran was arrested, she was able to see her children more frequently. She and Tiran also quarreled about financial matters. He was upset about the allocation of rental payments from a property known as the blue house. He repeatedly threatened her with fraud charges, and also threatened to sue her. The defendant was also very jealous, accusing her of having an affair with another man, which she denied. The defendant also accused her of selling his personal property behind his back after he was incarcerated.

Hutt's testimony did not have a great deal of probative value. She observed the defendant and Devan Casteel on the four-wheeler sometime between 10:00 and 10:30. The forced entry into [Eitzen's] residence did not occur until approximately 11:30. It would certainly not take one hour to travel the five miles to [Eitzen's] residence. The evidence concerning the four-wheeler generally lacked probative value. The fact that wire cutters were found on the four-wheeler was portrayed by the government as some evidence of criminal conduct by the defendant. The testimony of agent Dales regarding the characterization of the flashlight and wire cutters,

and indeed, the four-wheeler itself, as burglary tools was both irrelevant and highly prejudicial. Dales seem to think that the fact that fresh bean vines were found on the Quad–Runner was significant. However, [Eitzen's] residence is surrounded by corn. [Her] vehicle was found in a corn field, not a bean field. No wires or tinsnips were used to gain entry to [the] residence. The phone lines at [Eitzen's] residence had been pulled from the wall, not cut.

The government's theory at trial was apparently that the defendant and his accomplice had used the four-wheeler to take a back route into [Eitzen's] residence. This would have necessitated them driving through a farm field. This was nothing more than speculation on the government's part. [Eitzen's] residence is surrounded by corn fields. There is no evidence that taking the so-called back way to [Eitzen's] residence would require driving through a bean field. There is also no evidence presented that any fences in the vicinity had been cut.

The only forensic evidence found at the crime scene, a shoe print on [Eitzen's] door, actually tended to exculpate the defendants. Both defendants' footwear was seized following their arrest on September 12, 2008, and compared to the footwear impressions found on the door. Their shoes were eliminated as the source of the shoe print.

Tiran Casteel's Br. at 20–26 (internal citations to the record omitted). In his Reply, Tiran Casteel's attacks some of the remaining inculpatory evidence, stating:

The government also suggests that the handwritten "map" found at the defendant's residence showed a back way to the victim's house which would have required a four-wheeler or a lot of walking. Actually, the document in question is not a map, but rather consisted of written directions. Deputy Jake Daly also testified, however, that there was a second driveway to the victim's residence which can be accessed off of G Avenue. G Avenue is a gravel road, so no cross-country trip would be necessary.

Tiran Casteel's Reply at 10–11 (internal citations to the record omitted). The Government generally responds that, when viewed collectively, there is "ample evidence presented at trial to support both defendant's convictions." Pl.'s Resistance at 21–22. The Court agrees with the Government.

The Court finds that the weight of the evidence sufficiently supports the jury's verdicts, despite the Court's misgivings about portions of Wilcoxson's and Blank's testimony. The Government presented strong circumstantial evidence showing that Defendants robbed Eitzen and stole her car. As previously stated, Tiran Casteel was found in possession of a large number of collectible coins, some of which had Eitzen's late husband's handwriting on them. Tr. at 84–90, 101, 106–114. Additionally, Tiran Casteel's home contained both directions to Eitzen's house and a computer that was used to research Eitzen prior to the robbery and used to research the value of collectible coins immediately following the robbery. Id. at 120–21, 128–29, 313–19, 373–74; Exs. 4–1 to 4–169, 40. Moreover, the house contained a recently used four wheeler, which corroborates Anna Hutt's credible statements that Devan and Tiran Casteel left on a four wheeler immediately prior to the robbery. Id. Her testimony also draws strength from both her demeanor on the stand and her willingness to provide both inculpatory and exculpatory evidence, namely that Tiran Casteel had previously traded coins with Eitzen's deceased husband. Tr. at 491–92, 503. While the weight of each of these facts can be minimized as Defendants' arguments illustrate, the Court believes that

the collective strength of these facts create a strong inference that Defendants robbed Eitzen and took her car. Indeed, the Court's only concern is whether the Government offered sufficient, credible evidence of Defendants' conditional intent to seriously injury or kill Eitzen if she had resisted the robbery.

As referenced previously, the Court's analysis of whether Defendants possessed the requisite intent under the carjacking statute largely depends upon portions of Wilcoxson's and Blank's testimony. Wilcoxson testified that he participated in a "dry run" of the robbery with both Defendants, during which his task was to "pistol-whip" Eitzen if she resisted. Tr. at 447–48 ("Q. Now, what were you supposed to do if Ms. Eitzen resisted? A. Anything in my power. Pistol-whip her, hit her."). The Court has difficulty accepting this testimony because Wilcoxson only informed the Government about the "dry run" on the morning of trial, long after he began cooperating. Tr. at 465–69. Additionally, Wilcoxson has a penchant for dishonesty and a strong incentive to fabricate evidence against Defendants. Without Wilcoxson's testimony, the Court is left to rely on Blank's statements. Blank testified that Tiran Casteel attempted to recruit him in April or May of 2008 to participate in the robbery, stating:

Q. How did [Tiran Casteel] explain he intended to do it?

A. He said we'd use his four wheeler and go out there with his four wheeler, and that we would go in there and tie them up and we would have to hold them at gunpoint. We'd have to take the safes and gold, and stuff, and take that out and put it on the trailer to the four wheeler. Then he said he was going to take their cell phone and leave them tied up, and then call the police after we left.

Q. Did he say what you should do if anybody recognized you or him?

A. Yeah. He said that if—if we say any names or they recognized us, that we'd have to kill them or shoot them.

Tr. at 336–37. Even looking past his criminal history and crediting these statements, the Court does not find Blank's testimony strongly probative of Defendants' intent during the robbery, especially without Wilcoxson's corroborating statements regarding using force if Eitzen resisted. Tiran Casteel made these statements months before the robbery, and the robbery occurred differently than Tiran Casteel stated because Eitzen was never physically restrained. Additionally, the use of deadly force was only linked to Eitzen learning of their identities, not to any resistance. Nevertheless, the Court does find that Blank's testimony supports the notion that Defendants would have used force if Eitzen resisted. When the Court considers this in light of Defendants' decisions to point a firearm at Eitzen before giving her orders and to keep her under armed guard, the Court cannot disagree with the jury's verdicts. Accordingly, Defendants' Motions for New Trial are denied.[12]

### III. CONCLUSION

For the preceding reasons, the Court DENIES Defendants' Motions for Judg-

---

12. Tiran Casteel additionally argues in passing that the verdicts on the obstruction of justice and witness tampering charges are against the weight of evidence. See Tiran Casteel's Br. at 19. The Court disagrees because the recorded and written communication between Tiran Casteel and Wilcoxson strongly shows an attempt to arrange the murder of Eitzen after forcing her to recant. Moreover, the Court's conclusion remains even after discounting Wilcoxson's testimony regarding the "dry run" because Tiran Casteel's belief that Wilcoxson would assist him is still reasonable given their long history of Tiran Casteel dominating Wilcoxson. See Tr. at 422–485.

ment of Acquittal and New Trial (Clerk's Nos. 266, 283, 304). While the Government's charging decisions were fairly aggressive in this case, the evidence supports the charges and the resulting convictions.

IT IS SO ORDERED.